## LIMITED GUARANTY

**DATE OF THIS GUARANTY**: This Guaranty is dated as of August 13 , 2014.

**OWNER**: 615 Building Company, LLC ("Owner").

**TENANT**: FIFTHCNYC LLC, having an office at 800-B 800 Fifth Avenue, New York, New York, and its successors and assigns ("Tenant").

**PREMISES**: Suite 1 and Suite 2, consisting of a part of the Ground Floor and lower level of the building known as 800 B Fifth Avenue, New York, New York (the "Premises"), more particularly described in the Lease (as hereinafter defined).

**LEASE**: Agreement of Lease, executed and delivered by Owner and Tenant, dated as of the date of this Guaranty (as the same may be amended from time to time, the "Lease"). Capitalized terms not defined herein have the meanings specified in the Lease.

**GUARANTOR**: Shaindy Weisz

1.    In consideration of, and as an inducement for, the granting, execution and delivery of the Lease and in further consideration of the sum of One Dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor hereby absolutely, unconditionally and irrevocably guarantees to Owner the payment and performance of Tenant's obligations under the Lease, including, without limitation, the full and prompt payment of fixed annual rent, additional rent and all other charges and sums (including, without limitation, Owner's legal expenses and attorneys' fees and disbursements incurred by Owner pursuant to the Lease or in enforcing this Guaranty) payable by Tenant, its successors and assigns under the Lease for the period up to and including the date (the "Surrender Date") upon which Tenant shall have: (a) vacated the Premises and surrendered the same to Owner in the condition required by the Lease; (b) fulfilled Tenant's obligations under the Lease with respect to the payment of Fixed annual rent, additional rent and all other charges and sums (including, without limitation, Owner's legal expenses and attorneys' fees and expenses incurred pursuant to the Lease or in enforcing this Guaranty) and the performance of all obligations to be performed by Tenant under the Lease for the period through and including the date Tenant so vacated the Premises; (c) delivered at least one set of keys to the Premises to Owner; and (d) executed and delivered to Owner an agreement, in a form reasonably satisfactory to Owner, pursuant to which Tenant and all subtenants and occupants of all or any part of the Premises agree that the Lease and any subleases and any right of Tenant and all subtenants and occupants of all or any part of the Premises to use or occupy all or any part of the Premises shall have terminated (the "Surrender Agreement"); however, the execution and delivery of the Surrender Agreement and the delivery of possession of the Premises to Owner and the acceptance thereof by Owner shall not release Tenant of any of its obligations under the Lease.

2.    This Guaranty is an absolute, unconditional and irrevocable guaranty of payment and performance. The liability of Guarantor hereunder is co-extensive with that of Tenant with respect to the obligations guaranteed hereunder; and this Guaranty shall be enforceable against Guarantor without the necessity of any suit or proceedings on Owner's part of any kind or nature

whatsoever against Tenant or any other party and without the necessity of any notice of non-payment, non-performance or non-observance, or any notice of acceptance of this Guaranty, or any other notice or demand to which Guarantor might otherwise be entitled, all of which Guarantor hereby expressly waives.

3.      Guarantor hereby expressly agrees that this Guaranty shall be a continuing guaranty and that the validity of this Guaranty and the obligations and liability of Guarantor hereunder shall in no way be affected by reason of (a) the assertion of or the failure by Owner to assert against Tenant any of the rights or remedies reserved to Owner pursuant to the Lease or any modification thereof, or (b) any assignment of the Lease, or (c) any subletting by Tenant of all or any portion of the Premises, or (d) any renewal or extension of the Lease or any modification thereof, whether pursuant to the Lease or by subsequent agreement of Owner and Tenant, or (e) any extension of time that may be granted by Owner to Tenant, or (f) any consent, indulgence or other action, inaction or omission under or in respect of the Lease (other than a default by Owner under the Lease), or (g) any other dealings or transactions between Owner and Tenant, including, without limitation, any modification thereof, or (h) any bankruptcy, insolvency, reorganization, arrangement, assignment for the benefit of creditors, receivership or trusteeship affecting Tenant or Tenant's successors or assigns whether or not notice thereof is given to Guarantor, or (i) any invalidity, irregularity or unenforceability of the Lease, or (j) the application or retention by Owner of any security deposit held pursuant to the terms of the Lease, or (k) any matter or thing whatsoever, whether or not specifically mentioned herein, that might constitute a defense to the enforcement of this Guaranty or discharge of Guarantor hereunder.

4.      Notwithstanding any payments made by Guarantor pursuant to this Guaranty, Guarantor may only seek to enforce or collect upon any rights which it now has or may acquire against Tenant either by way of subrogation, indemnity, reimbursement or contribution for any amount paid under this Guaranty prior to the date on which all amounts due and owing by Tenant to Owner shall have been paid in full if any amounts collected by Guarantor from Tenant are first applied to the obligations of Guarantor under this Guaranty. In the event either a petition is filed under any bankruptcy or insolvency laws in regard to Tenant or an action or proceeding is commenced for the benefit of Tenant's creditors, this Guaranty shall at all times thereafter remain effective in regard to any payments or other transfers of assets to Owner received from or on behalf of Tenant and which are or may be held voidable on the grounds of preference, fraud or otherwise, whether or not all such amounts due and owing Owner under the Lease shall have been paid in full.

5.      Guarantor hereby (a) represents to Owner that it is a sole beneficial owner of Tenant, (b) represents to Owner that all of the representations made by Tenant in the Lease and the information as to Guarantor set forth at the end of this Guaranty are true, accurate and complete, (c) represents to Owner that Guarantor is not entitled, directly or indirectly, to diplomatic or sovereign immunity, (d) consents to the jurisdiction of the courts of the State of New York located in the County of New York and the Federal courts sitting in the State of New York and shall be subject to service of process in the State of New York with respect to any disputes arising, directly or indirectly, out of this Guaranty and (e) irrevocably designates and appoints Tenant as its authorized agent to accept and acknowledge on its behalf service of process with respect to any disputes arising, directly or indirectly, out of this Guaranty.

6.      This Guaranty sets forth the entire understanding of Owner and Guarantor with respect to Guarantor's guaranty of Tenant's obligations under the Lease, and Guarantor absolutely, unconditionally and irrevocably waives, and by its acceptance of this Guaranty Owner acknowledges and agrees that it also hereby waives, any and all right to assert any defense, setoff, counterclaim or crossclaim of any nature whatsoever with respect to this Guaranty or the obligations of Guarantor or any other person or party (including, without limitation, Tenant pursuant to Paragraph 1 of this Guaranty) relating hereto or to the Lease. Guarantor hereby waives trial by jury and the right thereto in any action or proceeding of any kind or nature, arising on, under or by reason of or relating to, this Guaranty or any agreement collateral hereto.   No waiver or modification of any provision of this Guaranty) nor any termination of this Guaranty shall be effective unless in writing and signed by the party against whom enforcement is sought, nor shall any waiver be applicable, except in the specific instance for which it is given.   This Guaranty shall be binding upon Guarantor and the heirs, personal representatives, successors and assigns of Guarantor and inure to the benefit of Owner and its successors and assigns.   This Guaranty may be executed in counterpart originals or with counterpart signature pages.

If more than one Guaranty of the Lease is executed or if more than one person or entity executes this Guaranty, the liability of all such guarantors shall be joint and several.

SIGNATURE: _Shaindy Lax_

PRINT NAME: Shaindy Weisz - Lax

RESIDENCE ADDRESS: 1653 58TH ST, BROOKLYN, NY, 11204

OFFICE ADDRESS: 580 FIFTH AVE, 34TH FLOOR, NEW YORK, NY, 10036

SOCIAL SECURITY NUMBER: ███████████

JAMIE KAUFMAN
Notary Public - State of New York
NO. 02KA6129948
Qualified in New York County
My Commission Expires 1/3/18

27852732v.5

## STANDARD FORM OF OFFICE LEASE
### The Real Estate Board of New York, Inc.

3-1-86

**Agreement of Lease,** made as of this      day of   August, 2014  , between

615 Building Company, LLC having an address c/o Bernard Spitzer, 730 Fifth Avenue, Suite 2202, New York, New York 10019

party of the first part, hereinafter referred to as OWNER, and   FIFTHCNYC LLC

New York, New York            having an office at 800- Fifth Avenue,

**Witnesseth:**      Owner hereby leases to Tenant and Tenant hereby hires from Owner   party of the second part, hereinafter referred to as TENANT.   the space (the "demised premises") known as Suite

as shown on the plan attached hereto as Exhibit A

in the building known as 800   Fifth Avenue

in the Borough of Manhattan     , City of New York,       , New York, New York 10016 (the "Building")

(or until such term shall sooner cease and expire as hereinafter provided) to commence on the and to end as provided in Article 73

both dates inclusive, at an annual rental rate of (without electricity) as provided in Article 39

(1) which Tenant agrees to pay in lawful money of the United States which shall be legal tender in payment of all debts and dues, public and private, at the time of payment, in equal monthly installments in advance on the first day of each month during said term, at the office of Owner or such other place as Owner may designate, without any set off or deduction whatsoever, except that Tenant shall pay the first      monthly installment(s) on the execution hereof (unless this lease be a renewal).

In the event that, at the commencement of the term of this lease, or thereafter, Tenant shall be in default in the payment of rent to Owner pursuant to the terms of another lease with Owner or with Owner's predecessor in interest, Owner may at Owner's option and without notice to Tenant add the amount of such arrears to any monthly installment of rent payable hereunder and the same shall be payable to Owner as additional rent.

The parties hereto, for themselves, their heirs, distributees, executors, administrators, legal representatives, successors and assigns, hereby covenant as follows:

**Rent**      1.   Tenant shall pay the rent as above and as hereinafter provided.

**Occupancy**    2.   Tenant shall use and occupy demised premises only as permitted under Article 58.

**Tenant Alterations:**   3.   Tenant shall make no changes in or to the demised premises of any nature without Owner's prior written consent. Subject to the prior written consent of Owner, and to the provisions of this article, Tenant at Tenant's expense, may make alterations, installations, additions or improvements which do not affect utility services or plumbing and electrical lines, in or to the interior of the demised premises by using contractors or mechanics first approved by Owner. Tenant shall, before making any alterations, additions, installations or improvements, at its expense, obtain all permits, approvals and certificates required by any governmental or quasi-governmental bodies and (upon completion) certificates of final approval thereof and shall deliver promptly duplicates of all such permits, approvals and certificates to Owner and Tenant agrees to carry and will cause Tenant's contractors and sub-contractors to carry such workman's compensation, general liability, personal and property damage insurance as Owner may require. If any mechanic's lien is filed against the demised premises, or the building of which the same forms a part, for work claimed to have been done for, or materials furnished to, Tenant, whether or not done pursuant to this article, the same shall be discharged by Tenant within thirty days thereafter, at Tenant's expense, by filing the bond required by law. All fixtures and all paneling, partitions, railings and like installations, installed in the premises at any time, either by Tenant or by Owner in Tenant's behalf, shall, upon installation, become the property of Owner and shall remain upon and be surrendered with the demised premises unless Owner, by notice to Tenant no later than twenty days prior to the date fixed as the termination of this lease, elects to relinquish Owner's right thereto and to have them removed by Tenant, in which event the same shall be removed from the premises by Tenant prior to the expiration of the lease, at Tenant's expense. Nothing in this Article shall be construed to give Owner title to or to prevent Tenant's removal of trade fixtures, moveable office furniture and equipment, but upon removal of any such from the premises or upon removal of other installations as may be required by Owner, Tenant shall immediately and at its expense, repair and restore the premises to the condition existing prior to installation and repair any damage to the demised premises or the building due to such removal. All property permitted or required to be removed, by Tenant at the end of the term remaining in the premises after Tenant's removal shall be deemed abandoned and may, at the election of Owner, either be retained as Owner's property or may be removed from the premises by Owner, at Tenant's expense.

**Maintenance and Repairs**   4.   Tenant shall, throughout the term of this lease, take good care of the demised premises and the fixtures and appurtenances therein, Tenant shall be responsible for all damage or injury to the demised premises or any other part of the building and the systems and equipment thereof, whether requiring structural or nonstructural repairs caused by or resulting from carelessness, omission, neglect or improper conduct of Tenant, Tenant's subtenants, agents, employees, invitees or licensees, or

(1)      , recoupment, demand

(2)      payment or by

(3)      specific performance and Tenant shall not have any claim for damages including

and for no other purpose.

which arise out of any work, labor, service or equipment done for or supplied to Tenant or any subtenant or arising out of the installation, use or operation of the property or equipment of Tenant or any subtenant. Tenant shall also repair all damage to the building and the demised premises caused by the moving of Tenant's fixtures, furniture and equipment. Tenant shall promptly make, at Tenant's expense, all repairs in and to the demised premises for which Tenant is responsible, using only the contractor for the trade or trades in question, selected from a list of at least two contractors per trade submitted by Owner. Any other repairs in or to the building or the facilities and systems thereof for which Tenant is responsible shall be performed by Owner at the Tenant's expense. Owner shall maintain in good working order and repair the exterior and the structural portions of the building, including the structural portions of its demised premises, and the public portions of the building interior and the building plumbing, electrical, heating and ventilating systems (to the extent such systems presently exist) serving the demised premises. Tenant agrees to give prompt notice of any defective condition in the premises for which Owner may be responsible hereunder. There shall be no allowance to Tenant for diminution of rental value and no liability on the part of Owner by reason of inconvenience, annoyance or injury to business arising from Owner or others making repairs, alterations, additions or improvements in or to any portion of the building or the demised premises or in and to the fixtures, appurtenances or equipment thereof. It is specifically agreed (1) that Tenant shall not be entitled to any set off or reduction of rent by reason of any failure of Owner to comply with the covenants of this or (3) any other article of this lease. Tenant agrees that Tenant's sole remedy at law in such instance will be by way of an action for damages for breach of contract. The provisions of this Article 4 shall not apply in the case of fire or other casualty which are dealt with in Article 9 hereof.

**Window Cleaning:**   5.   Tenant will not clean nor require, permit, suffer or allow any window in the demised premises to be cleaned from the outside in violation of Section 202 of the Labor Law or any other applicable law or of the Rules of the Board of Standards and Appeals, or of any other Board or body having or asserting jurisdiction.

**Requirements of Law, Fire Insurance, Floor Loads:**   6.   Prior to the commencement of the lease term, if Tenant is then in possession, and at all times thereafter, Tenant, at Tenant's sole cost and expense, shall promptly comply with all present and future laws, orders and regulations of all state, federal, municipal and local governments, departments, commissions and boards and any direction of any public officer pursuant to law, and all orders, rules and regulations of the New York Board of Fire Underwriters, Insurance Services Office, or any similar body which shall impose any violation, order or duty upon Owner or Tenant with respect to the demised premises, whether or not arising out of Tenant's use or manner of use thereof, (including Tenant's permitted use) or, with respect to the building if arising out of Tenant's

**[B]**

**(1)** use or manner of use of the premises or the building (including the use permitted under the lease). Nothing herein contained shall require Tenant to make structural repairs or alterations unless Tenant has, by instrument of use of the demised premises or method of operation therein, violated any such laws, ordinances, orders, rules, regulations or requirements with respect **[C]** thereto Tenant may, after securing Owner to Owner's satisfaction against all damages, interest, penalties and expenses, including, but not limited to, reasonable attorney's fees, by cash deposit or by surety bond in an amount and in a company satisfactory to Owner, contest and appeal any such laws, ordinances, orders, rules, regulations or requirements provided same is done with all reasonable promptness and provided such appeal shall not subject Owner to prosecution for a criminal offense or constitute a default under any lease or mortgage under which Owner may be obligated, or cause the demised premises or any part thereof to be condemned or vacated. Tenant shall not do or permit any act or thing to be done in or to the demised premises which is contrary to law, or which will invalidate or be in conflict with public liability, fire or other policies of insurance at any time carried by or for the benefit of Owner with respect to the demised premises or the building of which the demised premises form a part, or which shall or might subject Owner to any liability or responsibility to any person or for property damage. Tenant shall not keep anything in the demised premises except as now or hereafter permitted by the Fire Department, Board of Fire Underwriters, Fire Insurance Rating Organization or other authority having jurisdiction, and then only in such manner and such quantity so as not to increase the rate for fire insurance applicable to the building, nor use the premises in a manner which will increase the insurance rate for the building or any property located therein over that in effect prior to the commencement of Tenant's occupancy. Tenant shall pay all costs, expenses, fines, penalties, or damages, which may be imposed upon Owner by reason of Tenant's failure to comply with the provisions of this article and if by reason of such failure the fire insurance rate shall, at the beginning of this lease or at any time thereafter, be higher than it otherwise would be, then Tenant shall reimburse Owner, as additional rent hereunder, for that portion of all fire insurance premiums thereafter paid by Owner which shall have been charged because of such failure by Tenant. In any action or proceeding wherein Owner and Tenant are parties, a schedule or "make-up" of rate for the building or demised premises issued by the New York Fire Insurance Exchange, or other body making fire insurance rates applicable to said premises shall be conclusive evidence of the facts therein stated and of the several items and charges in the fire insurance rates then applicable to said premises. Tenant shall not place a load upon any floor of the demised premises exceeding the floor load per square foot area which it was designed to carry and which is allowed by law. Owner reserves the right to prescribe the weight and position of all safes, business machines and mechanical equipment. Such installations shall be placed and maintained by Tenant, at Tenant's expense, in settings sufficient, in Owner's judgement, to absorb and prevent vibration, noise and annoyance.

**Subordination:** 7. This lease is subject and subordinate to all ground or underlying leases and to all mortgages which may now or hereafter affect such leases or the real property of which demised premises are a part and to all renewals, modifications, consolidations, replacements and extensions of any such underlying leases and mortgages. This clause shall be self-operative and no further instrument of subordination shall be required by any ground or underlying lessor or by any mortgagee, affecting any lease or the real property of which the demised premises are a part. In confirmation of such subordination, Tenant shall execute promptly any certificate that Owner may request.

**[D]**

**Property—Loss, Damage, Reimbursement, Indemnity:** 8. Owner or its agents shall not be liable for any damage to property of Tenant or of others entrusted to employees of the building, nor for loss of or damage to any property of Tenant by theft or otherwise, nor for any injury or damage to persons or property resulting from any cause of whatsoever nature, unless caused by or due to the negligence of Owner, its agents, servants or employees. Owner or its agents will not be liable for any such damage caused by other tenants or persons in, upon or about said building or caused by operations in construction of any private, public or quasi public work.

If at any time any windows of the demised premises are temporarily closed, darkened or bricked up for permanently closed, darkened or bricked up, if required by law) for any reason whatsoever including, but not limited to Owner's own acts, Owner shall not be liable for any damage Tenant may sustain thereby and Tenant shall not be entitled to any compensation therefor nor abatement or diminution of rent nor shall the same release Tenant from its obligations hereunder nor constitute an eviction. Tenant shall indemnify and save harmless Owner against and from all liabilities, obligations, damages, penalties, claims, costs and expenses for which Owner shall not be reimbursed by insurance, including reasonable attorneys fees, paid, suffered or incurred as a result of any breach by Tenant, Tenant's agents, contractors, employees, invitees or licensees, of **[E]** any covenant or condition of this lease, or the carelessness, negligence or improper conduct of the Tenant, Tenant's agents, contractors, employees, invitees or licensees. Tenant's liability under this lease extends to the acts and omissions of any sub-tenant, and any agent, contractor, employee, invitee or licensee of any sub-tenant. In case any action or proceeding is brought against Owner by reason of any such claim, Tenant, upon written notice from Owner, will, at Tenant's expense, resist or defend such action or proceeding by counsel approved by Owner in writing, such approval not to be unreasonably withheld.

**Destruction, Fire and Other Casualty:** 9. (a) If the demised premises or any part thereof shall be damaged by fire or other casualty, Tenant shall give immediate notice thereof to Owner and this lease shall continue in full force and effect except as hereinafter set forth. (b) If the demised premises are partially damaged or rendered partially unusable by fire or other casualty, the damages thereto shall be repaired by and at the expense of Owner and the rent, until such repair shall be substantially completed, shall be apportioned from the day following the casualty according to the part of the premises which is **[F]** usable (c) If the demised premises are totally damaged or rendered wholly unusable by fire or other casualty, then the rent shall be proportionately paid up to the time of the casualty and thenceforth shall cease until the

date when the premises shall have been repaired and restored by Owner, subject to Owner's right to elect not to restore the same as hereinafter provided. (d) If the demised premises are rendered wholly unusable or (whether or not the demised premises are damaged in whole or in part) if the building shall be so damaged that Owner shall decide to demolish it or to rebuild it, then, in any of such events, Owner may elect to terminate this lease by written notice to Tenant, given within 90 days after such fire or casualty, specifying a date for the expiration of the lease, which date shall not be more than 60 days after the giving of such notice, and upon the date specified in such notice the term of this lease shall expire as fully and completely as if such date were the date set forth above for the termination of this lease and Tenant shall forthwith quit, surrender and vacate the premises without prejudice however, to Landlord's rights and remedies against Tenant under the lease provisions in effect prior to such termination, and any rent owing shall be paid up to such date and any payments of rent made by Tenant which were on account of any period subsequent to such date shall be returned to Tenant. Unless Owner shall serve a termination notice as provided for herein, Owner shall make the repairs and restorations under the conditions of (b) and (c) hereof, with all reasonable expedition, subject to delays due to adjustment of insurance claims, labor troubles and causes beyond Owner's control. After any such casualty, Tenant shall cooperate with Owner's restoration by removing from the premises as promptly as reasonably possible, all of Tenant's salvageable inventory and movable equipment, furniture, and other property. Tenant's liability for rent shall resume five (5) days after written notice from Owner that the premises are substantially ready for Tenant's occupancy. (e) Nothing contained hereinabove shall relieve Tenant from liability that may exist as a result of damage from fire or other casualty. Notwithstanding the foregoing, each party shall look first to any insurance in its favor before making any claim against the other party for recovery for loss or damage resulting from fire or other casualty, and to the extent that such insurance is in force and collectible and to the extent permitted by law, Owner and Tenant each hereby releases and waives all right of recovery against the other or any one claiming through or under each of them by way of subrogation or otherwise. The foregoing release and waiver shall be in force only if both releasors' insurance policies contain a clause providing that such a release or waiver shall not invalidate the insurance. If, and to the extent, that such waiver can be obtained only by the payment of additional premiums, then the party benefiting from the waiver shall pay such premium within ten days after written demand or shall be deemed to have agreed, that the party obtaining insurance coverage shall be free of any further obligation under the provisions hereof with respect to waiver of subrogation. Tenant acknowledges that Owner will not carry insurance on Tenant's furniture and/or furnishings or any fixtures or equipment, improvements, or appurtenances removable by Tenant and agrees that Owner will not be obligated to repair any damage thereto or replace the same. (f) Tenant hereby waives the provisions of Section 227 of the Real Property Law and agrees that the provisions of this article shall govern and control in lieu thereof.

**Eminent Domain:** 10. If the whole or any part of the demised premises shall be acquired or condemned by Eminent Domain for any public or quasi public use or purpose, then and in that event, the term of this lease shall cease and terminate from the date of title vesting in such proceeding and Tenant shall have no claim for the value of any unexpired term of said lease and assigns to Owner, Tenant's entire interest in any such award.

**Assignment, Mortgage, Etc.:** 11. Tenant, for itself, its heirs, distributees, executors, administrators, legal representatives, successors and assigns, expressly covenants that it shall not assign, mortgage or encumber this agreement, nor underlet, or suffer or permit the demised premises or any part thereof to be used by others, without the prior written consent of Owner in each instance. Transfer of the majority of the stock of a corporate Tenant shall be deemed an assignment. If this lease be assigned, or if the demised premises or any part thereof be underlet or occupied by anybody other than Tenant, Owner may, after default by Tenant, collect rent from the assignee, under-tenant or occupant, and apply the net amount collected to the rent herein reserved, but no such assignment, underletting, occupancy or collection shall be deemed a waiver of this covenant, or the acceptance of the assignee, under-tenant or occupant as tenant, or a release of Tenant from the further performance by Tenant of covenants on the part of Tenant herein contained. The consent by Owner to an assignment or underletting shall not in any wise be construed to relieve Tenant from obtaining the express consent in writing of Owner to any further assignment or underletting.

**[G]**

**Electric Current:** 12. ~~Rates and conditions in respect to submetering or~~ ~~rent inclusion, as the case may be, to be added in~~ RIDER attached hereto. Tenant covenants and agrees that at all times its use of electric current shall not exceed the capacity of existing feeders to the building or the risers or wiring installation and Tenant may not use any electrical equipment which, in Owner's opinion, reasonably exercised, will overload such installations or interfere with the use thereof by other tenants of the building. The change at any time of the character of electric service shall in no wise make Owner liable or responsible to Tenant, for any loss, damages or expenses which Tenant may sustain.

**Access to Premises:** 13. Owner or Owner's agents shall have the right (but shall not be obligated) to enter the demised premises in any emergency at any time, and, at other reasonable times to examine the same and to make such repairs, replacements and improvements as Owner may deem necessary and reasonably desirable to the demised premises or to any other portion of the building or which Owner may elect to perform. Tenant shall permit Owner to use and maintain and replace pipes and conduits in and through the demised premises and to erect new pipes and conduits therein provided they are concealed within the walls, floor, or ceiling. Owner may, during the progress of any work in the demised premises, take all necessary materials and equipment into said premises without the same constituting an eviction nor shall the Tenant be entitled to any abatement of rent while such work is in progress nor to any damages by reason of loss or interruption of business or otherwise. **(3)** Throughout the term hereof Owner shall have the right to enter the demised premises at reasonable hours for the purpose of showing the

☞ Rider to be added if necessary.

**(1)** alterations of the demised premises

**(2)** to substantially the condition existing prior to such fire or other casualty, however, Owner's obligation to repair shall not include improvements made by Tenant or any party other than Owner

**(3)** to inspect the demised premises,

same to prospective purchasers or mortgagees of the building, and during the last six months of the term for the purpose of showing the same to prospective tenants. If Tenant is not present to open and permit an entry into the premises, Owner or Owner's agents may enter the same whenever such entry may be necessary or permissible by master key or forcibly and provided reasonable care is exercised to safeguard Tenant's property, such entry shall not render Owner or its agents liable therefor, nor in any event shall the obligations of Tenant hereunder be affected. If during the last month of the term Tenant shall have removed all or substantially all of Tenant's property therefrom. Owner may immediately enter, alter, renovate or redecorate the demised premises without limitation or abatement of rent, or incurring liability to Tenant for any compensation and such act shall have no effect on this lease or Tenant's obligations hereunder. ¶

**Vault, Vault Space, Area:**  14.  No Vaults, vault space or area, whether or not enclosed or covered, not within the property line of the building is leased hereunder, anything contained in or indicated on any sketch, blue print or plan, or anything contained elsewhere in this lease to the contrary notwithstanding. Owner makes no representation as to the location of the property line of the building. All vaults and vault space and all such areas not within the property line of the building, which Tenant may be permitted to use and/or occupy, is to be used and/or occupied under a revocable license, and if any such license be revoked, or if the amount of such space or area be diminished or required by any federal, state or municipal authority or public utility, Owner shall not be subject to any liability nor shall Tenant be entitled to any compensation or diminution or abatement of rent, nor shall such revocation, diminution or requisition be deemed constructive or actual eviction. Any tax, fee or charge of municipal authorities for such vault or area shall be paid by Tenant.

**Occupancy:**  15.  Tenant will not at any time use or occupy the demised premises in violation of the certificate of occupancy issued for the building of which the demised premises are a part. Tenant has inspected the premises and accepts them as is, subject to the riders annexed hereto with respect to Owner's work, if any. In any event, Owner makes no representation as to the condition of the premises and Tenant agrees to accept the same subject to violations, whether or not of record.

**Bankruptcy:**  16.  (a) Anything elsewhere in this lease to the contrary notwithstanding, this lease may be cancelled by Owner by the sending of a written notice to Tenant within a reasonable time after the happening of any one or more of the following events: (1) the commencement of a case in bankruptcy or under the laws of any state naming Tenant as the debtor; or (2) the making by Tenant of an assignment or any other arrangement for the benefit of creditors under any state statute. Neither Tenant nor any person claiming through or under Tenant, or by reason of any statute or order of court, shall thereafter be entitled to possession of the premises demised but shall forthwith quit and surrender the premises. If this lease shall be assigned in accordance with its terms, the provisions of this Article 16 shall be applicable only to the party then owning Tenant's interest in this lease.

(b) it is stipulated and agreed that in the event of the termination of this lease pursuant to (a) hereof, Owner shall forthwith, notwithstanding any other provisions of this lease to the contrary, be entitled to recover from Tenant as and for liquidated damages an amount equal to the difference between the rent reserved hereunder for the unexpired portion of the term demised and the fair and reasonable rental value of the demised premises for the same period. In the computation of such damages the difference between any installment of rent becoming due hereunder after the date of termination and the fair and reasonable rental value of the demised premises for the period for which such installment was payable shall be discounted to the date of termination at the rate of four percent (4%) per annum. If such premises or any part thereof be relet by the Owner for the unexpired term of said lease, or any part thereof, before presentation of proof of such liquidated damages to any court, commission or tribunal, the amount of rent reserved upon such reletting shall be deemed to be the fair and reasonable rental value for the part or the whole of the premises so re-let during the term of the re-letting. Nothing herein contained shall limit or prejudice the right of the Owner to prove for and obtain as liquidated damages by reason of such termination, an amount equal to the maximum allowed by any statute or rule of law in effect at the time when, and governing the proceedings in which, such damages are to be proved, whether or not such amount be greater, equal to, or less than the amount of the difference referred to above.

**Default:**  17.  (1) If Tenant defaults in fulfilling any of the covenants of this lease other than the covenants for the payment of rent or additional rent; ~~or if the demised premises becomes vacant or deserted~~ or if any execution or attachment shall be issued against Tenant or any of Tenant's property whereupon the demised premises shall be taken or occupied by someone other than Tenant; or if this lease be rejected under § 235 of Title 11 of the U.S. Code (bankruptcy code); or, if Tenant shall fail to move into or take possession of the premises within ~~fifteen (15) days after the commencement of the term of this lease~~, then, in any one or more of such events, upon Owner serving a written ~~five (5)~~ (1) days notice upon Tenant specifying the nature of said default and upon the expiration of said ~~five (5)~~ days, if Tenant shall have failed to comply with or remedy such default, or if the said default or omission complained of shall be of a nature that the same cannot be completely cured or remedied within said ~~five (5)~~ (1) day period, and if Tenant shall not have diligently commenced during such default within said ~~five (5)~~ (1) day period, and shall not thereafter with reasonable diligence and in good faith proceed to remedy or cure such default, then Owner may serve a written ~~three (3) days'~~ (1) notice of cancellation of this lease upon Tenant, and upon the expiration of said ~~three (3)~~ (2) days after the date and time and upon the expiration and expire as fully and completely as if the expiration of such ~~three (3) day~~ (2) period were the day herein definitely fixed for the end and expiration of this lease and the term thereof and Tenant shall then quit and surrender the demised premises to Owner but Tenant shall remain liable as (2) hereinafter provided.

(1) twenty (20)
(2) five (5)

(2) If the notice provided for in (1) hereof shall have been given, and the term shall expire as aforesaid; or if Tenant shall make default in the payment of the rent reserved herein or any item of additional rent herein mentioned or any part of either or in making any other payment herein required; then and in any of such events Owner may without notice, re-enter the demised premises either by force or otherwise, and dispossess Tenant by summary proceedings or otherwise, and the legal representative of Tenant or other occupant of demised premises and remove their effects and hold the premises as if this lease had not been made, and Tenant hereby waives the service of notice of intention to re-enter or to institute legal proceedings to that end. If Tenant shall make default hereunder prior to the date fixed as the commencement of any renewal or extension of this lease, Owner may cancel and terminate such renewal or extension agreement by written notice.

**Remedies of Owner and Waiver of Redemption:**  18.  In case of any such default, re-entry, expiration and/or dispossess by summary proceedings or otherwise, (a) the rent shall become due thereupon and be paid up to the time of such re-entry, dispossess and/or expiration, (b) Owner may re-let the premises or any part or parts thereof, either in the name of Owner or otherwise, for a term or terms, which may at Owner's option be less than or exceed the period which would otherwise have constituted the balance of the term of this lease and may grant concessions or free rent or charge a higher rental than that in this lease, and/or (c) Tenant or the legal representatives of Tenant shall also pay Owner as liquidated damages for the failure of Tenant to observe and perform said Tenant's covenants herein contained, any deficiency between the rent hereby reserved and/or covenanted to be paid and the net amount, if any, of the rents collected on account of the lease or leases of the demised premises for each month of the period which would otherwise have constituted the balance of the term of this lease. The failure of Owner to re-let the premises or any part or parts thereof shall not release or affect Tenant's liability for damages. In computing such liquidated damages there shall be added to the said deficiency such expenses as Owner may incur in connection with re-letting, such as legal expenses, attorneys' fees, brokerage, advertising and for keeping the demised premises in good order for preparing the same for re-letting. Any such liquidated damages shall be paid in monthly installments by Tenant on the rent day specified in this lease and any suit brought to collect the amount of the deficiency for any month shall not prejudice in any way the rights of Owner to collect the deficiency for any month by any subsequent month by a similar proceeding. Owner, in putting the demised premises in good order or preparing the same for re-rental may, at Owner's option, make such alterations, repairs, replacements, and/or decorations in the demised premises as Owner, in Owner's sole judgment, considers advisable and necessary for the purpose of re-letting the demised premises, and the making of such alterations, repairs, replacements and/or decorations shall not operate or be construed to release Tenant from liability hereunder as aforesaid. Owner shall in no event be liable in any way whatsoever for failure to re-let the demised premises, or in the event that the demised premises are re-let, for failure to collect the rent thereof under such re-letting, and in no event shall Tenant be entitled to receive any excess, if any, of such net rents collected over the sums payable by Tenant to Owner hereunder. In the event of a breach or threatened breach by Tenant of any of the covenants or provisions hereof, Owner shall have the right of injunction and the right to invoke any remedy allowed at law or in equity as if re-entry, summary proceedings and other remedies were not herein provided for. Mention in this lease of any particular remedy, shall not preclude Owner from any other remedy, in law or in equity. Tenant hereby expressly waives any and all rights of redemption granted by or under any present or future laws in the event of Tenant being evicted or dispossessed for any cause, or in the event of Owner obtaining possession of demised premises, by reason of the violation by Tenant of any of the covenants and conditions of this lease, or otherwise.

**Fees and Expenses:**  19.  If Tenant shall default in the observance or performance of any term or covenant on Tenant's part to be observed or performed under or by virtue of any of the terms or provisions in any article of this lease, then, unless otherwise provided elsewhere in this lease, Owner may immediately or at any time thereafter and without notice perform the obligation of Tenant thereunder. If Owner, in connection with the foregoing or in connection with any default by Tenant in the covenant to pay rent hereunder, makes any expenditures or incurs any obligations for the payment of money, including but not limited to attorney's fees, in instituting, prosecuting or defending any action or proceeding, then Tenant will reimburse Owner for such sums so paid or obligations incurred with interest and costs. The foregoing expenses incurred by reason of Tenant's default shall be deemed to be additional rent hereunder and shall be paid by Tenant to Owner within five (5) days of rendition of any bill or statement to Tenant therefor. If Tenant's lease term shall have expired at the time of making of such expenditures or obligations, such sums shall be recoverable by Owner as damages.

**Building Alterations and Management:**  20.  Owner shall have the right at any time without the same constituting an eviction and without incurring liability to Tenant therefor to change the arrangement and/or location of public entrances, passageways, doors, doorways, corridors, elevators, stairs, toilets or other public parts of the building and to change the name, number or designation by which the building may be known. There shall be no allowance to Tenant for diminution of rental value and no liability on the part of Owner by reason of inconvenience, annoyance or injury to business arising from Owner or other tenants making any repairs in the building or any such alterations, additions and improvements. Furthermore, Tenant shall not have any claim against Owner by reason of Owner's imposition of such controls of the manner of access to the building by Tenant's social or business visitors as the Owner may deem necessary for the security of the building and its occupants.

**No Representations by Owner:**  21.  Neither Owner nor Owner's agents have made any representations or promises with respect to the physical condition of the building, the land upon which

it is erected or the demised premises, the rents, leases, expenses of operation or any other matter or thing affecting or related to the premises except as herein expressly set forth and no rights, easements or licenses are acquired by Tenant by implication or otherwise except as expressly set forth in the provisions of this lease. Tenant has inspected the building and the demised premises and is thoroughly acquainted with their condition and agrees to take the same "as is" and acknowledges that the taking of possession of the demised premises by Tenant shall be conclusive evidence that the said premises and the building of which the same form a part were in good and satisfactory condition at the time such possession was so taken, except as to latent defects. All understandings and agreements heretofore made between the parties hereto are merged in this contract, which alone fully and completely expresses the agreement between Owner and Tenant and any executory agreement hereafter made shall be ineffective to change, modify, discharge or effect an abandonment of it in whole or in part, unless such executory agreement is in writing and signed by the party against whom enforcement of the change, modification, discharge or abandonment is sought.

**End of Term:** 22. Upon the expiration or other termination of the term of this lease, Tenant shall quit and surrender to Owner the demised premises, broom clean, in good order and condition, ordinary wear and damages which Tenant is not required to repair as provided elsewhere in this lease excepted, and Tenant shall remove all its property. Tenant's obligation to observe or perform this covenant shall survive the expiration or other termination of this lease. If the last day of the term of this Lease or any renewal thereof, falls on Sunday, this lease shall expire at noon on the preceding Saturday unless it be a legal holiday in which case it shall expire at noon on the preceding business day.

**Quiet Enjoyment:** 23. Owner covenants and agrees with Tenant that upon Tenant paying the rent and additional rent and observing and performing all the terms, covenants and conditions, on Tenant's part to be observed and performed, Tenant may peaceably and quietly enjoy the premises hereby demised, subject, nevertheless, to the terms and conditions of this lease including, but not limited to, Article 31 hereof and to the ground leases, underlying leases and mortgages hereinbefore mentioned.

**Failure to Give Possession:** 24. If Owner is unable to give possession of the demised premises on the date of the commencement of the term hereof, because of the holding-over or retention of possession of any tenant, undertenant or occupants or if the demised premises are located in a building being constructed, because such building has not been sufficiently completed to make the premises ready for occupancy or because of the fact that a certificate of occupancy has not been procured or for any other reason, Owner shall not be subject to any liability for failure to give possession on said date and the validity of the lease shall not be impaired under such circumstances, nor shall the same be construed in any wise to extend the term of this lease, but the rent payable hereunder shall be abated (provided Tenant is not responsible for Owner's inability to obtain possession) until after Owner shall have given Tenant written notice that the premises are substantially ready for Tenant's occupancy. If permission is given to Tenant to enter into the possession of the demised premises or to occupy premises other than the demised premises prior to the date specified as the commencement of the term of this lease, Tenant covenants and agrees that such occupancy shall be deemed to be under all the terms, covenants, conditions and provisions of this lease, except as to the covenant to pay rent. The provisions of this article are intended to constitute "an express provision to the contrary" within the meaning of Section 223-a of the New York Real Property Law.

**No Waiver:** 25. The failure of Owner to seek redress for violation of, or to insist upon the strict performance of any covenant or condition of this lease or of any of the Rules or Regulations, set forth or hereafter adopted by Owner, shall not prevent a subsequent act which would have originally constituted a violation from having all the force and effect of an original violation. The receipt by Owner of rent with knowledge of the breach of any covenant of this lease shall not be deemed a waiver of such breach and no provision of this lease shall be deemed to have been waived by Owner unless such waiver be in writing signed by Owner. No payment by Tenant or receipt by Owner of a lesser amount than the monthly rent herein stipulated shall be deemed to be other than on account of the earliest stipulated rent, nor shall any endorsement or statement of any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction, and Owner may accept such check or payment without prejudice to Owner's right to recover the balance of such rent or pursue any other remedy in this lease provided. No act or thing done by Owner or Owner's agents during the term hereby demised shall be deemed an acceptance of a surrender of said premises, and no agreement to accept such surrender shall be valid unless in writing signed by Owner. No employee of Owner or Owner's agent shall have any power to accept the keys of said premises prior to the termination of the lease and the delivery of keys to any such agent or employee shall not operate as a termination of the lease or a surrender of the premises.

**Waiver of Trial by Jury:** 26. It is mutually agreed by and between Owner and Tenant that the respective parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other (except for personal injury or property damage) on any matters whatsoever arising out of or in any way connected with this lease, the relationship of Owner and Tenant, Tenant's use of or occupancy of said premises, and any emergency statutory or any other statutory remedy. It is further mutually agreed that in the event Owner commences any summary proceeding for possession of the premises, Tenant will not interpose any counterclaim of whatever nature or description in any such proceeding including a counterclaim under Article 4.

**Inability to Perform:** 27. This Lease and the obligation of Tenant to pay rent hereunder and perform all of the other covenants and agreements hereunder on part of Tenant to be performed shall in no wise be affected, impaired or excused because Owner is

☞ Rider to be added if necessary.

(1) 7:00 AM to 7:00 PM
(2) Sundays from (:00 A.M. to 5:00 P.M.

---

unable to fulfill any of its obligations under this lease or to supply or is delayed in supplying any service expressly or impliedly to be supplied or is unable to make, or is delayed in making any repair, additions, alterations or decorations or is unable to supply or is delayed in supplying any equipment or fixtures if Owner is prevented or delayed from so doing by reason of strike or labor troubles or any cause whatsoever including, but not limited to, government preemption in connection with a National Emergency or by reason of any rule, order or regulation of any department or subdivision thereof of any government agency or by reason of the conditions of supply and demand which have been or are affected by war or other emergency.

**Bills and Notices:** 28. Except as otherwise in this lease provided, a bill, statement, notice or communication which Owner may desire or be required to give to Tenant, shall be deemed sufficiently given or rendered if, in writing, delivered to Tenant personally or sent by registered or certified mail addressed to Tenant at the building of which the demised premises form a part or at the last known residence address or business address of Tenant or left at any of the aforesaid premises addressed to Tenant, and the time of the rendition of such bill or statement and of the giving of such notice or communication shall be deemed to be the time when the same is delivered to Tenant, mailed, or left at the premises as herein provided. Any notice by Tenant to Owner must be served by registered or certified mail addressed to Owner at the address first hereinabove given or at such other address as Owner shall designate by written notice.

**Services Provided by Owners:** 29. As long as Tenant is not in default under any of the covenants of this lease, Owners shall provide: (a) necessary elevator facilities on business days from 8 a.m. to 6 p.m. and on Saturdays from 8 a.m. to 1 p.m. and have one elevator subject to call at all other times; (b) heat to the demised premises when and as required by law, on business days from 8 a.m. to 6 p.m. and on Saturdays from 8 a.m. to 1 p.m.; (c) water for ordinary lavatory purposes, but if Tenant uses or consumes water for any other purposes or in unusual quantities (of which fact Owner shall be the sole judge), Owner may install a water meter at Tenant's expense which Tenant shall thereafter maintain at Tenant's expense in good working order and repair to register such water consumption and Tenant shall pay for water consumed as shown on said meter as additional rent as and when bills are rendered; (d) cleaning service for the demised premises on business days at Owner's expense provided that the same are kept in order by Tenant. If, however, said premises are to be kept clean by Tenant, it shall be done at Tenant's sole expense, in a manner satisfactory to Owner and no one other than persons approved by Owner shall be permitted to enter said premises or the building of which they are a part for such purpose. Tenant shall pay Owner, the cost of removal of any of Tenant's refuse and rubbish from the building; (e) if the demised premises are serviced by Owner's air-conditioning/cooling and ventilating system, air conditioning/cooling will be furnished to Tenant from May 15th through September 30th on business days (Mondays through Fridays, holidays excepted) from 8:00 a.m. to 6:00 p.m., and ventilation will be furnished on business days during the aforesaid hours except when air-conditioning/cooling is being furnished as aforesaid. If Tenant requires air conditioning/cooling or ventilation for more extended hours or on Saturdays, Sundays or on holidays, as defined under Owner's contract with Operating Engineers Local 94-94A, Owner will furnish the same at Tenant's expense. RIDER to be added in respect to rates and conditions for such additional service; (f) Owner reserves the right to stop services of the heating, elevators, plumbing, air-conditioning, power systems or cleaning or other services, if any, when necessary by reason of accident or for repairs, alterations, replacements or improvements necessary or desirable in the judgment of Owner for as long as may be reasonably required by reason thereof. If the building of which the demised premises are a part supplies manually-operated elevator service, Owner at any time may substitute automatic-control elevator service and upon ten days' written notice to Tenant, proceed with alterations necessary therefor without in any wise affecting this lease or the obligation of Tenant hereunder. The same shall be done with a minimum of inconvenience to Tenant and Owner shall pursue the alteration with due diligence.

**Captions:** 30. The Captions are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this lease nor the intent of any provisions thereof.

**Definitions:** 31. The term "office", or "offices", wherever used in this lease, shall not be construed to mean premises used as stores or stores, for the sale or display, at any time, of goods, wares or merchandise, of any kind, or as a restaurant, shop, booth, bootblack or other stand, barber shop, or for other similar purposes or for manufacturing. The term "Owner" means a landlord or lessor, and as used in this lease means only the owner, or the mortgagee in possession, for the time being of the land and building (or the owner of a lease of the building or of the land and building) of which the demised premises form a part, so that in the event of any sale or sales of said land and building or of said lease, or in the event of a lease of said building, or of the land and building, the said Owner shall be and hereby is entirely freed and relieved of all covenants and obligations of Owner hereunder, and it shall be deemed and construed without further agreement between the parties or their successors in interest, or between the parties and the purchaser, at any such sale, or the said lessee of the building, or of the land and building, that the purchaser or the lessee of the building has assumed and agreed to carry out any and all covenants and obligations of Owner, hereunder. The words "re-enter" and "re-entry" as used in this lease are not restricted to their technical legal meaning. The term "business days" as used in this lease shall exclude Saturdays (except such portion thereof as is covered by specific hours in Article 29 hereof), Sundays and all days observed by the State or Federal Government as legal holidays and those designated as holidays by the applicable building service union employees service contract or by the applicable Operating Engineers contract with respect to HVAC service.

**Adjacent Excavation— Shoring:** 22. If an excavation shall be made upon land adjacent to the demised premises, or shall be authorized to be made, Tenant shall afford to the person causing or authorized to cause such excavation, license to enter upon the demised premises for the purpose of doing such work as said person shall deem necessary to preserve the wall or the building of which demised premises form a part from injury or damage and to support the same by proper foundations without any claim for damages or indemnity against Owner, or diminution or abatement of rent.

**Rules and Regulations:** 23. Tenant and Tenant's servants, employees, agents, visitors, and licensees shall observe faithfully, and comply strictly with, the Rules and Regulations and such other and further reasonable Rules and Regulations as Owner or Owner's agents may from time to time adopt. Notice of any additional rules or regulations shall be given in such manner as Owner may elect. In case Tenant disputes the reasonableness of any additional Rule or Regulation hereafter made or adopted by Owner or Owner's agents, the parties hereto agree to submit the question of the reasonableness of such Rule or Regulation for decision to the New York office of the American Arbitration Association, whose determination shall be final and conclusive upon the parties hereto. The right to dispute the reasonableness of any additional Rule or Regulation upon Tenant's part shall be deemed waived unless the same shall be asserted by service of a notice, in writing upon Owner within ten (10) days after the giving of notice thereof. Nothing in this lease contained shall be construed to impose upon Owner any duty or obligation to enforce the Rules and Regulations or terms, covenants or conditions in any other lease, as against any other tenant and Owner shall not be liable to Tenant for violation of the same by any other tenant, its servants, employees, agents, visitors or licensees.

**Security:** 33. Tenant has deposited with Owner the sum of $1,690,500.00 as security for the faithful performance and observance by Tenant of the terms, provisions and conditions of this lease; it is agreed that in the event Tenant defaults in respect of any of the terms, provisions and conditions of this lease, including, but not limited to, the payment of rent and additional rent, Owner may use, apply or retain the whole or any part of the security so deposited to the extent required for the payment of any rent and additional rent or any other sum [text continues]

☞ Space to be filled in or deleted.

**CONTINUED ON RIDER ANNEXED HERETO AND MADE A PART HEREOF.**

**In Witness Whereof,** Owner and Tenant have respectively signed and sealed this lease as of the day and year first above written.

Witness for Owner:

OWNER:   615 BUILDING COMPANY, LLC

By: .....................................

Name:  *Bernard Spitzer*

Title:  *Manager*   [L.S.]

TENANT:   FIFTEENYC LLC

By: .....................................   *Shandy Lax*

Name:  *Chana Weisz-Lax*

Title:  *Director*   [L.S.]

## ACKNOWLEDGMENTS

CORPORATE OWNER
STATE OF NEW YORK,
County of *New York* ss.:

On this *22* day of *August* *2014*, before me personally came *Bernard Spitzer* to me known, who being by me duly sworn, did depose and say that he resides in

that he is the *Manager* of *615 Building Company, LLC* the corporation described in and which executed the foregoing instrument, as OWNER; that he knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation, and that he signed his name thereto by like order.

.....................................

INDIVIDUAL OWNER
STATE OF NEW YORK,
County of ss.:

On this day of , 19 , before me personally came

to me known, and known to me to be the individual described in and who, as OWNER, executed the foregoing instrument and acknowledged to me that he executed the same.

.....................................

**CHARLES MORISI**
Notary Public, State of New York
No. 24-4970342
Qualified in Kings County
Commission Expires August 13, 20 18

CORPORATE TENANT
STATE OF NEW YORK,
County of *New York* ss.:

On this *19th* day of *August* *2014*, before me personally came *Shandy Lax / Chana Weisz-Lax* to me known, who being by me duly sworn, did depose and say that she resides in *New York*

that she is the *Director* of the corporation described in and which executed the foregoing instrument, as TENANT; that she knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation, and that she signed her name thereto by like order.

.....................................

INDIVIDUAL TENANT
STATE OF NEW YORK,
County of ss.:

On this day of , 19 , before me personally came

to me known, and known to me to be the individual described in and who, as TENANT, executed the foregoing instrument and acknowledged to me that he executed the same.

.....................................

**JAMIE KAUFMAN**
Notary Public - State of New York
NO. 02KA6129948
Qualified in New York County
My Commission Expires 4/3/18

# GUARANTY

FOR VALUE RECEIVED, and in consideration for, and as an inducement to Owner making the within lease with Tenant, the undersigned guarantees to Owner, Owner's successors and assigns, the full performance and observance of all the covenants, conditions and agreements, therein provided to be performed and observed by Tenant, including the "Rules and Regulations" as therein provided, without requiring any notice of non-payment, non-performance, or non-observance, or proof, or notice, or demand, whereby to charge the undersigned therefor, all of which the undersigned hereby expressly waives and expressly agrees that the validity of this agreement and the obligations of the guarantor hereunder shall in no wise be terminated, affected or impaired by reason of the assertion by Owner against Tenant of any of the rights or remedies reserved to Owner pursuant to the provisions of the within lease. The undersigned further covenants and agrees that this guaranty shall remain and continue in full force and effect as to any renewal, modification or extension of this lease and during any period when Tenant is occupying the premises as a "statutory tenant." As a further inducement to Owner to make this lease and in consideration thereof, Owner and the undersigned covenant and agree that in any action or proceeding brought by either Owner or the undersigned against the other on any matters whatsoever arising out of, under, or by virtue of the terms of this lease or of this guaranty that Owner and the undersigned shall and do hereby waive trial by jury.

Dated New York City ................................................,19..........

the foregoing Guaranty and acknowledged to me that he executed the same.

WITNESS:

...................................................................

Notary

STATE OF NEW YORK, }
County of } ss.:

On this .......... day of .......... , 19 .. before me

personally came

to me known and known to me to be the individual described in, and who executed

...........................................[L. S.]

Residence ...........................................................

Business Address ...................................................

Firm Name ...........................................................

## ☞ IMPORTANT - PLEASE READ ☜

## RULES AND REGULATIONS ATTACHED TO AND MADE A PART OF THIS LEASE
## IN ACCORDANCE WITH ARTICLE 33.

1. The sidewalks, entrances, driveways, passages, courts, elevators, vestibules, stairways, corridors or halls shall not be obstructed or encumbered by any Tenant or used for any purpose other than for ingress or egress from the demised premises and for delivery of merchandise and equipment in a prompt and efficient manner using elevators and passageways designated for such delivery by Owner. There shall not be used in any space, or in the public hall of the building, either by any Tenant or by jobbers or others in the delivery or receipt of merchandise, any hand trucks, except those equipped with rubber tires and sideguards. If said premises are situated on the ground floor of the building, Tenant thereof shall further, at Tenant's expense, keep the sidewalk and curb in front of said premises clean and free from ice, snow, dirt and rubbish.

2. The water and wash closets and plumbing fixtures shall not be used for any purposes other than those for which they were designed or constructed and no sweepings, rubbish, rags, acids or other substances shall be deposited therein, and the expense of any breakage, stoppage, or damage resulting from the violation of this rule shall be borne by the Tenant who, or whose clerks, agents, employees or visitors, shall have caused it.

3. No carpet, rug or other article shall be hung or shaken out of any window of the building; and no Tenant shall sweep or throw or permit to be swept or thrown from the demised premises any dirt or other substances into any of the corridors or halls, elevators, or out of the doors or windows or stairways of the building and Tenant shall not use, keep or permit to be used or kept any foul or noxious gas or substance in the demised premises, or permit or suffer the demised premises to be occupied or used in a manner offensive or objectionable to Owner or other occupants of the buildings by reason of noise, odors, and/or vibrations, or interfere in any way with other Tenants or those having business therein, nor shall any animals or birds be kept in or about the building. Smoking or carrying lighted cigars or cigarettes in the elevators of the building is prohibited.

4. No awnings or other projections shall be attached to the outside walls of the building without the prior written consent of Owner.

5. No sign, advertisement, notice or other lettering shall be exhibited, inscribed, painted or affixed by any Tenant on any part of the outside of the demised premises or the building or on the inside of the demised premises if the same is visible from the outside of the premises without the prior written consent of Owner, except that the name of Tenant may appear on the entrance door of the premises. In the event of the violation of the foregoing by any Tenant, Owner may remove same without any liability, and may charge the expense incurred by such removal to Tenant or Tenants violating this rule. Interior signs on doors and directory tablet shall be inscribed, painted or affixed for each Tenant by Owner at the expense of such Tenant, and shall be of a size, color and style acceptable to Owner.

6. No Tenant shall mark, paint, drill into, or in any way deface any part of the demised premises or the building of which they form a part. No boring, cutting or stringing of wires shall be permitted, except with the prior written consent of Owner, and as Owner may direct. No Tenant shall lay linoleum, or other similar floor covering, so that the same shall come in direct contact with the floor of the demised premises, and, if linoleum or other similar floor covering is desired to be used an interlining of builder's deadening felt shall be first affixed to the floor, by a paste or other material, soluble in water, the use of cement or other similar adhesive material being expressly prohibited.

7. No additional locks or bolts of any kind shall be placed upon any of the doors or windows by any Tenant, nor shall any changes be made in existing locks or mechanism thereof. Each Tenant must, upon the termination of his Tenancy, restore to Owner all keys of stores, offices and toilet rooms, either furnished to, or otherwise procured by, such Tenant, and in the event of the loss of any keys, so furnished, such Tenant shall pay to Owner the cost thereof.

8. Freight, furniture, business equipment, merchandise and bulky matter of any description shall be delivered to and removed from the premises only on the freight elevators and through the service entrances and corridors, and only during hours and in a manner approved by Owner. Owner reserves the right to inspect all freight to be brought into the building and to exclude from the building all freight which violates any of these Rules and Regulations of the lease or which these Rules and Regulations are a part.

9. Canvassing, soliciting and peddling in the building is prohibited and each Tenant shall cooperate to prevent the same.

10. Owner reserves the right to exclude from the building between the hours of 6 P.M. and 8 A.M. and at all hours on Sundays, and legal holidays all persons who do not present a pass to the building signed by Owner. Owner will furnish passes to persons for whom any Tenant requests same in writing. Each Tenant shall be responsible for all persons for whom he requests such pass and shall be liable to Owner for all acts of such persons.

11. Owner shall have the right to prohibit any advertising by any Tenant which in Owner's opinion, tends to impair the reputation of the building or its desirability as as a building for offices, and upon written notice from Owner, Tenant shall refrain from or discontinue such advertising.

12. Tenant shall not bring or permit to be brought or kept in or on the demised premises, any inflammable, combustible or explosive fluid, material, chemical or substance, or cause or permit any odors of cooking or other processes, or any unusual or other objectionable odors to permeate in or emanate from the demised premises.

13. If the building contains central air conditioning and ventilation, Tenant agrees to keep all windows closed at all times and to abide by all rules and regulations issued by the Owner with respect to such services. If Tenant requires air conditioning or ventilation after the usual hours, Tenant shall give notice in writing to the building superintendent prior to 3:00 P.M., in the case of services required on week days, and prior to 3:00 P.M., on the day prior in the case of after hours service required on weekends or on holidays.

14. Tenant shall not move any safe, heavy machinery, heavy equipment, bulky matter, or fixtures into or out of the building without Landlord's prior written consent. If such safe, machinery, equipment, bulky matter or fixtures requires special handling, all work in connection therewith shall comply with the Administrative Code of the City of New York and all other laws and regulations applicable thereto and shall be done during such hours as Owner may designate.

STANDARD FORM OF

# Office Lease

The Real Estate Board of New York, Inc.
©Copyright 1993. All rights Reserved.
Reproduction in whole or in part prohibited.

Address

Premises

TO

Dated

Rent per Year

Rent per Month

Term
From
To

19

Drawn by

Entered by

Checked by

Approved by

INSERTS TO PRINTED FORM OF LEASE BETWEEN
615 BUILDING COMPANY, LLC, AS LANDLORD,
AND FIFTHCNYC LLC., AS TENANT,
AT 800 FIFTH AVENUE, NEW YORK, NEW YORK

A.      , which consent shall not be (a) required for purely decorative changes such as painting, decorating, wallpapering, and carpeting, or (b) unreasonably withheld or delayed with respect to any other changes that are nonstructural, which do not affect the Building's exterior and do not adversely affect the Building's systems and facilities.

B.      particular

C.      It is specifically understood that it shall be Landlord's obligation to make any and all repairs and/or alterations required to be performed in order to cure any violations of any federal, state, or local laws, ordinances, rules, regulations or requirements arising from or relating to conditions existing in the demised premises prior to the commencement of the lease term.

D.      or willful misconduct

E.      except to the extent caused by the gross negligence or willful misconduct by Landlord, or Landlord's

F.      or inaccessible

G.      on reasonable (but not less than 24 hours) advance notice to Tenant which notice may be oral,

H.      Landlord shall use all reasonable efforts to minimize the disruption of, and interference with, Tenant's use and occupancy of the demised premises while making any such repairs, replacements or improvements.  Landlord further agrees to perform all such work with due diligence.  Nothing contained in this lease shall require Landlord to use overtime labor or incur other additional expense to do so.

I.      , in each event for a period of ten (10) days following written notice that the same is due,

J.      or Tenant, as the case may be,

K.      Landlord agrees that it shall not enforce the Rules and Regulations against Tenant in discriminatory manner.

31636899v.2

RIDER TO LEASE DATED AUGUST ___, 2014
BETWEEN 615 BUILDING COMPANY LLC, AS OWNER,
AND FIFTHCNYC LLC, AS TENANT.

37. Escalations.

(a)     The terms defined below shall for the purposes of this Lease have the meanings herein specified:

(i)     "Taxes" shall mean all real estate taxes and assessments, special or otherwise, levied, assessed or imposed by the City of New York, or any other taxing authorities upon or with respect to the Building and all taxes assessed or imposed with respect to the rentals payable hereunder (other than general income and gross receipts taxes of Owner unless covered by the provisions of the following sentence). Taxes shall also include any taxes, charges or assessments levied, assessed or imposed by any taxing authority in lieu of or in addition to the present method of real estate taxation, provided such taxes are computed as if the Building were the sole property of Owner subject to said tax, charge or assessment. With respect to any Tax Year (hereinafter defined), all reasonable third-party expenses, including legal fees, experts' and other witnesses' fees, incurred in contesting the validity or amount of any Taxes or in obtaining a refund of Taxes, shall be considered as part of the Taxes for such Tax Year. Tenant acknowledges that Taxes and the Tax Payment (hereinafter defined) are calculated by the method set forth in this Article 37 and are not necessarily based on the Taxes actually payable by Owner. Taxes shall exclude penalties or interest, excise taxes on Owner's gross or net rentals or other income; income, franchise, transfer, gift, estate, succession, inheritance and capital stock taxes.

(ii)     "Real Property" shall mean the Building and the land on which the Building is located (the "Land").

(iii)     "Base Tax Year" shall mean the fiscal tax year commencing July 1, 2013 and ending June 30, 2014.

(iv)     "Base Taxes" shall mean the amount of Taxes payable by Owner with respect to the Real Property in the Base Tax Year.

(v)     "Tax Amount" shall mean the amount of Taxes payable by Owner with respect to the Real Property in a Tax Year, determined as if the Real Property did not benefit from, and without giving effect to, any abatement or exemption or the party responsible for or actually paying taxes.

(vi)     "Tax Year" shall mean each twelve-month (12) period commencing on the first day of July of each such period, in which occurs any part of the term of this Lease or such other twelve month (12) period during the term of this Lease as hereafter may be duly adopted as the fiscal year for real estate tax purposes of the City of New York.

(vii)     "Tenant's Percentage" shall mean 1.44% prior to the Suite 2 Commencement Date and 1.87% after the Suite 2 Commencement Date. In the event that after the Commencement Date, the rentable square footage of the Building is increased due to a new addition made to the Building that results in additional rentable square footage, Tenant's Percentage shall be adjusted ratably.

(viii)     "Owner's Statement" shall mean an instrument or instruments setting forth the amount payable by Tenant for a specified Tax Year as additional rent pursuant to this Article 37.

(ix)     "Base Price Index" shall mean the Price Index for the month in which the lease is executed.

(b)     If the Tax Amount for any Tax Year shall exceed the Base Taxes, Tenant shall pay to Owner as additional rent an amount (the "Tax Payment") equal to Tenant's Percentage of such excess. Upon request, during any Tax Year, Owner will furnish Tenant with a copy of the tax bill for such Tax Year. To the extent that Owner is permitted to pay Taxes in installments, the Tax Payment payable by Tenant hereunder shall also be paid by Tenant in installments at least thirty (30) days prior to the date Owner's installment is first due, unless Owner has not provided Tenant with such notice at least thirty (30) days prior to the date such payment is due, in which case Tenant shall pay Owner within five (5) days after the date Owner sends such notice.

(c)     If the amount for which the Real Property is assessed which had been

utilized in computing the Base Taxes is reduced (as a result of settlement, final determination of legal proceedings or otherwise) then, and in such event: (i) the Base Taxes shall be retroactively adjusted to reflect such reduction, (ii) the Tax Payments theretofore paid or payable shall be recomputed and Tenant shall pay as additional rent any deficiency between the Tax Payments theretofore paid or payable and the amount due as a result of such recomputation, and (iii) all retroactive additional rent from such retroactive adjustment shall be payable when billed by Owner. Owner shall promptly send to Tenant a statement setting forth the basis for such retroactive adjustment and additional rent payments.

(d) If Owner shall receive a refund of Taxes for any Tax Year with respect to which Tenant made a Tax Payment, Owner shall set forth in the first Owner's Statement thereafter submitted to Tenant the amount of such refund and the amount of the legal fees and other expenses incurred in connection with the collection of such refund, and, provided that Tenant is not then in default under this Lease, Tenant shall receive a refund or a credit against the installment or installments of rent next falling due hereunder equal to Tenant's Percentage of the amount by which such refund exceeds said fees and expenses, but in no event shall such refund or credit exceed the Tax Payment paid by Tenant for such Tax Year. Tenant shall not have the right to bring or join in tax certiorari proceedings or other proceedings contesting the amount or validity of any Taxes.

(e) Owner may furnish to Tenant, prior to the commencement of each Tax Year a written statement setting forth Owner's reasonable estimate of the Tax Payment for the next Tax Year. Tenant shall pay to Owner on the first day of each month during such Tax Year an amount equal to one-twelfth (1/12th) of Owner's estimate of the Tax Payment for such Tax Year. If, however, Owner shall not furnish any such estimate for a Tax Year or, if Owner shall furnish any such estimate for a Tax Year subsequent to the commencement thereof, then (i) until the first day of the month following the month in which such estimate is furnished to Tenant, Tenant shall pay to Owner on the first day of each month an amount equal to the monthly sum payable by Tenant to Owner under this Article 37 in respect of the last month of the preceding Tax Year; (ii) after such estimate is furnished to Tenant, Owner shall give notice to Tenant stating whether the installments of Tax Payment previously made for such Tax Year were greater or less than the installments of the Tax Payment to be made for such Tax Year in accordance with such estimate, and (A) if there shall be a deficiency, Tenant shall pay the amount thereof within ten (10) business days after written demand therefor, or (B) if there shall have been an overpayment, Owner shall credit to Tenant the amount thereof; and (iii) on the first day of the month following the month in which such estimate is furnished to Tenant and monthly thereafter throughout the remainder of such Tax Year, Tenant shall pay to Owner an amount equal to one-twelfth (1/12th) of the Tax Payment shown on such estimate.

(f) Owner shall furnish to Tenant an Owner's Statement for each Tax Year. If Owner did not furnish to Tenant a statement of estimated Tax Payment under Article 37(f) then Tenant shall pay to Owner, within fifteen (15) days of the furnishing of Owner's Statement, the Tax Payment for such Tax Year. If Owner has furnished to Tenant a statement of estimated Tax Payment under Article 37(g), then if Owner's Statement shall show that the sums paid by Tenant under Article 37(f) exceeded the Tax Payment to be paid by Tenant for such Tax Year, Owner shall refund or credit to Tenant the amount of such excess; and if Owner's Statement for such Tax Year shall show that the sums so paid by Tenant were less than the Tax Payment to be paid by Tenant for such Tax Year, Tenant shall pay the amount of such deficiency within ten (10) business days after written demand therefor.

(g) Owner's failure to render Owner's Statement with respect to any Tax Year shall not prejudice Owner's right to thereafter render an Owner's Statement with respect thereto or with respect to any such Tax Year nor shall the rendering of an Owner's Statement prejudice Owner's right to thereafter render a corrected Owner's Statement for that Tax Year.

(h) Notwithstanding any termination of this Lease prior to the lease expiration date, Tenant's obligation to pay rent as adjusted under this Article shall continue and shall cover all periods up to the lease expiration date and such payment obligations shall survive any expiration or termination of this Lease.

38. Intentionally Omitted.

39. Fixed Annual Rent.

(a) The fixed annual rent payable hereunder with respect to Suite 1, for each twelve (12) month period beginning on the Suite 1 Rent Commencement Date (as hereinafter

defined) and expiring on the day preceding each anniversary of the Suite 1 Rent Commencement Date (each such twelve (12) month period constituting a "Suite 1 Lease Year") is as follows:

| Lease Year | Annual Fixed Rent | Monthly Fixed Rent |
|---|---|---|
| 1 | $600,000.00 | $50,000.00 |
| 2 | $618,000.00 | $51,500.00 |
| 3 | $636,540.00 | $53,045.00 |
| 4 | $655,636.20 | $54,636.35 |
| 5 | $675,307.08 | $56,275.59 |
| 6 | $695,566.20 | $57,963.85 |
| 7 | $716,433.12 | $59,702.76 |
| 8 | $737,926.08 | $61,493.84 |
| 9 | $760,063.80 | $63,338.65 |
| 10 | $782,865.60 | $65,238.80 |
| 11 | $806,351.52 | $67,195.96 |

(b) The fixed annual rent payable hereunder with respect to Suite 2 for each twelve (12) month period beginning on the Suite 2 Rent Commencement Date (as hereinafter defined) and expiring on the day preceding each anniversary of the Suite 2 Commencement Date (each such twelve (12) month period constituting a "Suite 2 Lease Year") is as follows:

| Lease Year | Annual Fixed Rent | Monthly Fixed Rent |
|---|---|---|
| 1 | $245,250.00 | $20,437.50 |
| 2 | $252,607.44 | $21,050.62 |
| 3 | $260,185.56 | $21,682.13 |
| 4 | $267,991.08 | $22,332.59 |
| 5 | $276,030.72 | $23,002.56 |
| 6 | $284,311.56 | $23,692.63 |
| 7 | $292,844.80 | $24,403.40 |
| 8 | $301,626.00 | $25,135.50 |
| 9 | $310,674.72 | $25,889.56 |
| 10 | $319,994.88 | $26,666.24 |

(c) If the Suite 1 Rent Commencement Date, the Suite 2 Rent Commencement Date or the Expiration Date occur on a date other than the first or last day, respectively, of a calendar month, then the fixed rent for the partial calendar month in which the Suite 1 Rent Commencement Date, the Suite 2 Rent Commencement Date or the Expiration Date occur shall be a prorated portion of the full installment of the fixed rent, and in the case of a partial month in which either the Suite 1 Rent Commencement Date or the Suite 2 Rent Commencement Date occur, shall be payable on the Suite 1 Rent Commencement Date, the Suite 2 Rent Commencement Date, as the case may be.

40. Broker.  Tenant and Owner each represents that it has dealt with no broker in connection with this transaction other than NRT New York LLC d/b/a The Corcoran Group (the "Broker").  Tenant hereby indemnifies and holds Owner harmless from any claim for brokerage commission made by any party other than the Broker claiming to have procured Tenant or to have acted for or on behalf of Tenant in this transaction.  Owner hereby indemnifies and holds Tenant harmless from any claim for brokerage commission made by any party including the Broker claiming to have procured Tenant or to have acted for or on behalf of Owner in this transaction

41. <u>Tenant's Certificate and Notice to Owner</u>. (a)   Tenant shall, at any time and from time to time within ten (10) days after written demand, execute, acknowledge and deliver to Owner a statement in writing addressed to Owner and any other party requested by Owner certifying: (i) that this Lease is in full force and effect and is unmodified (or, if there have been modifications, specifying same), (ii) the dates to which fixed annual rent and additional rent have been paid, (iii) that Owner is not in default under this Lease (or if that is not the case, specifying each particular instance in which Tenant alleges that Owner is in default), and (iv) as to any other matters requested by Owner.

(b)   In the event of an act or omission or alleged act or omission by Owner which would give Tenant the right to terminate this Lease or to claim a partial or total eviction (if any), Tenant shall not exercise any such right unless: (i) Tenant shall first have given written notice of such act or omission to Owner and to the holder of any mortgage and the lessor under any superior lease covering the Building and (ii) neither Owner nor any mortgagee or lessor shall have cured or commenced to cure such act or omission within a reasonable period of time following the giving of such notice.

42. <u>Attornment</u>. If at any time or times during the term of this Lease, Owner shall be the holder of a leasehold estate covering all or a substantial portion of the Building and if such leasehold estate shall expire or terminate for any reason, or if all or a substantial portion of the Building shall be subject to any mortgage and if any such mortgage shall be foreclosed or if the Building shall be conveyed to the holder of any such mortgage in lieu of foreclosure, then Tenant shall, at the election and upon demand of any owner or lessor of all or part of the Building, or of any mortgagee in possession thereof (a "<u>Superior Party</u>"), attorn to such Superior Party upon the terms and conditions set forth herein for the remainder of the term of this Lease. The foregoing provisions shall inure to the benefit of any Superior Party and shall, in the event of any such election and demand, be self-operative without the necessity of the execution of any further instruments; but Tenant shall upon the demand of any Secured Party, execute, acknowledge and deliver any reasonable instrument or instruments confirming such attornment. Upon such attornment this Lease shall continue in full force and effect as a direct lease between the Superior Party and Tenant upon all of the terms and conditions set forth in this Lease except that the Superior Party shall not be: (a) liable for any previous act or omission of Owner under this Lease, (b) subject to any offset which had accrued to Tenant against any prior Owner, (c) obligated to complete any construction of the Building or the demised premises, (d) obligated to make any payment to or on behalf of Tenant, (e) required to account for any Security Deposit (hereinafter defined) other than any actually delivered to the Superior Party, or (f) bound by any previous modification of this Lease or by any prepayment of more than one month's fixed annual rent or additional rent unless such modification or prepatent was expressly approved in writing by the Superior Party. If any prospective or actual Superior Party requires any modification of this Lease, Tenant shall, upon notice thereof from Owner, promptly execute and deliver to Owner the instrument accompanying said notice from Owner to effect such modification if such modification does not adversely affect in any material respect any of Tenant's rights under this Lease and does not increase any of Tenant's monetary obligations or increase in any material respect any of Tenant's other obligations under this Lease. The foregoing provisions shall not be construed to limit or preclude any other rights which any Superior Party may then have under law or otherwise.

43. <u>Electricity</u>.

(a)   Tenant shall obtain all electric energy for the demised premises (including, without limitation, electric energy for the air-conditioning and ventilating equipment servicing the demised premises) directly from the public utility company furnishing electric service to the Building. The costs of such service shall be paid by Tenant directly to such public utility, but a default by Tenant in the payment of any bill or charge of such company shall be deemed a default by Tenant under this Lease. Tenant shall make no electrical installations, alterations, additions or changes to electrical equipment or appliances without the prior written consent of Owner in each instance. Tenant shall at all times comply with the rules, regulations, terms and conditions applicable to service, equipment, wiring and requirements of the utility supplying electricity to the Building. If, in Owner's sole judgment, Tenant's electrical requirements necessitate installation of additional risers, feeders or other proper and necessary equipment, and if Owner has approved such installation, the same shall be installed by Owner at Tenant's sole expense, which shall be chargeable and collectible as additional rent and paid within twenty (20) days after rendition of a bill to Tenant therefor. Rigid conduit only will be allowed. Owner shall

not be liable in any way to Tenant for any failure or defect in the supply or character of electrical service furnished to the demised premises by reason of any requirement, act or omission of the utility serving the Building or for any other reason not attributable to Owner.   Tenant acknowledges that the demised premises is served by more than one electric meter.

(b) Unless Owner otherwise elects, Owner shall furnish and install all lighting tubes, lamps, bulbs and ballasts used in the demised premises and Tenant shall pay as additional rent Owner's standard charges therefor on demand.

(c) Notwithstanding anything to the contrary contained in this Article, if an interruption or cessation of electricity results solely from the gross negligence or willful misconduct of Owner and the demised premises are not useable by Tenant for the conduct of Tenant's business as a result thereof and Tenant does not in fact use the demised premises for five (5) consecutive business days for any purpose, then as Tenant's sole remedy commencing on the sixth (6th) consecutive business day, fixed monthly rent shall be abated until the earlier to occur of the cessation of such interruption or the date Tenant resumes use of the demised premises.

44. <u>Late Payment</u>.  If any installment of rent due hereunder is not paid on or before the tenth (10th) day of the month during which such installment is due or any installment of additional rent due hereunder is not paid within ten (10) days after same is due, Tenant shall pay Owner as additional rent: (a) on or before the first day of the following month, five percent (5%) of the overdue amount (or such lesser amount as is the maximum amount permitted by law) in order to defray Owner's administrative and other costs in connection with such late payment (which sum Tenant acknowledges is fair and reasonable and does not constitute interest); and (b) if such amount remains unpaid for thirty (30) days after the date due, interest on all such rent and additional rent from the date same was originally due (without regard to any grace period) at the greater of: (i) eighteen percent (18%) per annum or (ii) five percent (5%) plus the prime rate of interest of Owner's bank in effect from time to time; but in neither of such events shall such interest be at a rate or amount which exceeds the maximum amount permitted by law).

45. <u>Owner's Liability</u>.  (a)  Owner (and its partners, shareholders, beneficial owners, employees and agents) shall have no personal liability with respect to this Lease.  If Owner is in breach or default under this Lease, Tenant shall look solely to the equity of Owner in the Building for the satisfaction of Tenant's remedies and in no event shall Tenant attempt to secure or execute any personal judgment against Owner (or its partners, shareholders, beneficial owners, employees or agents) by reason of such default by Owner.

(b) If this Lease provides that Owner shall act reasonably or not unreasonably withhold any consent or approval, Tenant shall not be entitled to make any claim for money damages against Owner for failure to act reasonably or to grant such consent or approval and Tenant's sole remedy shall be to bring an Expedited Arbitration Proceeding (as hereinafter defined) in accordance with the terms of <u>Article 81</u> herein, an action for specific performance or declaratory judgment and the right to recover reasonable attorneys fees and court costs unless Owner acted wrongfully and in bad faith.

46. <u>Additional Rent</u>.  All charges, costs and expenses which Tenant is obligated to pay hereunder, together with all interest and penalties that may accrue thereon in the event of Tenant's failure to pay the same as herein provided, all other damages, costs and expenses which Owner may suffer or incur, and any and all other sums which may become due by reason of any default of Tenant or failure on Tenant's part to comply with the agreements, terms, covenants and conditions of this Lease on Tenant's part to be performed shall be deemed to be additional rent and in the event of non-payment Owner shall have all the rights and remedies herein provided in the case of nonpayment of rent.  All fixed annual rent and additional rent shall be paid by good unendorsed check of Tenant drawn on a member of the New York Clearinghouse Association.

47. <u>Equipment</u>.  (a)  Subject to the provisions of <u>Articles 3, 43 and 71</u> Tenant shall have the right, at its own cost and expense, to install and maintain such equipment as Tenant may reasonably require for Tenant's business or profession.  Owner may direct that all wiring for such equipment other than standard light fixtures, computer equipment and office equipment be drawn directly from the location of the public utility lines located in the main meter room (or from the appropriate public utility lines if Owner determines that there is insufficient capacity in

the Building) and shall not be part of or connected to the wiring for the rest of the demised premises or the Building. If such equipment shall interfere with the normal operation of other equipment, radio reception or television reception in other parts of the Building, then and in that event Tenant, at its own cost and expense, shall either discontinue the use of such equipment in the demised premises or cause the same to be protected and shielded in such a manner that will prevent any disturbance to, or interference with, any equipment or radios or televisions in other parts of the Building. Tenant shall not place any load upon the floor of the demised premises in excess of the load per square foot it was designed to carry and which is permitted by law. As part of Tenant's initial alterations, subject to Owner's consent, Tenant may install one (1) safe that weighs less than 1,500 pounds (including the weight of any additional support needed in connection with the installation of such safe). Owner may reasonably prescribe the maximum weight for such equipment and the position thereof. All equipment shall be placed and maintained by Tenant in settings sufficient to absorb and prevent any vibration, noise and annoyance to other occupants of the Building. All work in connection with such installation shall be done in accordance with the rules and regulations of the governmental agencies having jurisdiction, the New York Fire Insurance Exchange and the New York Board of Fire Underwriters, and Tenant shall obtain and furnish to Owner all certificates and permits that may be required by same, if any.

(b) Tenant covenants and agrees not to execute any security agreements, Uniform Commercial Code Financing Statements, chattel mortgages, conditional bills of sale, leases or other title retention agreements or any modifications, extensions, replacement or amendments thereto in connection with the purchase of, or covering or affecting any fixtures, equipment or personal property used at the demised premises unless same relate only to personal property of Tenant which does not constitute a fixture or part of the Building under New York law and is not required by this Lease to remain in the demised premises at the expiration or termination of this Lease.

48. Conflict. In the event of any conflict or inconsistency between the printed provisions of this Lease and the provisions contained in this rider, the provisions of this rider shall govern.

49. Insurance. (a) Tenant shall at its own cost and expense at all times during the term of this Lease maintain in force and effect the following insurance with recognized insurance companies licensed to transact business in the State of New York and having a Best's rating of not less than A/XV:

(i) "All risk" insurance with extended coverage on leasehold improvements to and personal property located in the demised premises or used in connection therewith in an amount not less than replacement cost.

(ii) Business income insurance in an amount not less than the fixed annual rent and all other insurance reasonably necessary for the conduct of Tenant's business.

(iii) Commercial general liability insurance (including contractual liability) with limits, including umbrella policies, of not less than $3,000,000 for bodily injury or death to one person, $5,000,000 for bodily injury or death to more than one person, and $500,000 for property damage. The amount of such limits may be increased by Owner from time to time but not more often than once in each twelve month period and only to amounts consistent with increased limits then required by owners of buildings similar to the Building in Manhattan, New York.

(iv) Worker's compensation insurance in the statutorily required amounts.

(v) Such other insurance as Owner may from time to time reasonably require but not more often than once in each twelve month period and only to amounts consistent with increased limits then required by owners of buildings similar to the Building in Manhattan, New York.

(b) All insurance policies (other than Worker's Compensation) shall name Owner, its managing agent, the holder of any superior lease, any fee or leasehold mortgagee and any other parties designated by Owner as an additional insured, shall be fully paid for by Tenant when obtained and receipted bills therefor shall be exhibited to Owner, and shall contain a cross-

liability or severability endorsement. Renewal or replacement policies shall be procured and such policies or binders thereof submitted to Owner with receipted bills showing proof of payment of premiums therefor at least twenty (20) days prior to the expiration of the existing policies. All insurance policies shall provide that the insurer will not cancel or modify said policies without first giving Owner at least thirty (30) days prior written notice.

(c) In the event of the failure of Tenant to procure or pay for any insurance required by the terms of this Lease, Owner may, in addition to any other remedies it may have, procure the same and pay the premium therefor; any sums expended by Owner for this purpose shall be deemed additional rent and shall be paid to Owner on demand.

(d) If, by reason of either Tenant's misuse of the demised premises or the nature of the particular use to which the demised premises are being put by Tenant, any of the insurance premiums for the Building shall at any time during the term of this Lease be higher than the premiums that would be payable if not for such misuse or particular use of the demised premises by Tenant, Tenant shall pay Owner as additional rent the difference between the premiums actually paid by Owner and the premiums that would have been payable if not for such misuse or particular use.

50. Partnership Tenant. If Tenant is a partnership (or is comprised of two (2) or more persons, individually or as co-partners of a partnership) or if Tenant's interest in this Lease shall be validly assigned to a partnership or to two (2) or more persons, individually or as co-partners of a partnership (any such Partnership and such persons are referred to in this Article as "Partnership Tenant"), the following provisions shall apply to such Partnership Tenant: (a) the liability of each of the parties comprising Partnership Tenant shall be joint and several; (b) each of the parties comprising Partnership Tenant hereby consents in advance to, and agrees to be bound by, any modifications of this Lease which may hereafter be made and by any notices, demands, requests or other communications which may hereafter be given, by Partnership Tenant or any of the parties comprising Partnership Tenant; (c) any bills, statements, notices, demands, requests or other communications given or rendered to Partnership Tenant or to any of the parties comprising Partnership Tenant shall be deemed given or rendered to Partnership Tenant and to all such parties and shall be binding upon Partnership Tenant and all such parties; (d) if Partnership Tenant shall admit new partners, all of such new partners shall, by their admission to Partnership Tenant, be deemed to have assumed performance of all of the terms, covenants and conditions of this Lease on Tenant's part to be observed and performed; (e) Partnership Tenant shall give prompt notice to Owner of the admission of any such new partners, and upon demand of Owner, shall cause each such new partner to execute and deliver to Owner an agreement in form satisfactory to Owner, wherein each new partner confirms such assumption and agrees to perform all of the terms, covenants and conditions of this Lease on Tenant's part to be observed and performed (but neither Owner's failure to request any such agreement nor the failure of any such new partner to execute and deliver any such agreement to Owner shall vitiate any of the provisions of this Article); and (f) no partner shall be relieved of liability hereunder upon a withdrawal from Partnership Tenant or otherwise and the estate of any partner shall not be relieved of liability hereunder as a result of the death of any partner unless Owner shall have agreed to a release of liability.

51. Assignment and Sublease. (a) Owner shall not unreasonably withhold or delay its consent to the assignment of this Lease or the subleasing (except as otherwise specifically provided under this Article 51) by Tenant of all of either Suite 1 or Suite 2 (but not a portion of either one of them) provided that:

(i)     In the case of an assignment such assignment is made in connection with the sale of Tenant's retail business, which sale shall include, without limitation, all of Tenant's accounts receivable, business inventory and trade fixtures and the Security Deposit, if any, under this Lease.

(ii)     Tenant shall have furnished Owner with the name and address of the proposed assignee or subtenant and its principals and proof satisfactory to Owner evidencing that the proposed assignee or subtenant: (A) is experienced in and will secure personnel experienced in the retail business being conducted at the demised premises as permitted under the terms of this Lease; (B) is of sound financial condition considering the responsibilities involved; (C) is of good character; and (D) if a partnership, corporation or other entity, is validly

formed, is qualified to transact business in the State of New York and has duly authorized the signatories to sign all documents on its behalf so as to bind the assignee.

(iii)   Owner shall be deemed to have acted reasonably in withholding its consent to any sublease or assignment if: (A) in Owner's reasonable judgment the proposed assignee or subtenant is engaged in a business and the demised premises, or the relevant portion thereof, will be used in a manner which is not in keeping with the then standards of the Building, is for a proposed use other than the use expressly permitted under this Lease, or will violate any negative covenant as to use contained in any other lease of space in the Building; (B) either the proposed assignee or sublessee or any person which, directly or indirectly, controls, is controlled by, or is under common control with, the proposed assignee or sublessee or any person who controls the proposed assignee or sublessee, is then a tenant or occupant of any part of the Building; (C) the proposed assignee or sublessee is a person with whom Owner is then negotiating to lease space in the Building; (D) the form of the proposed sublease or assignment shall not be in form reasonably satisfactory to Owner or shall not comply with the applicable provisions of this Article; (E) there shall be more than one (1) occupant (including Tenant but excluding any licensees under Article 51(i)) in the demised premises; (F) and the rental and other terms and conditions of the sublease are not the same as those contained in the proposed sublease furnished to Owner pursuant to Article 51(a)(v)(A); (G) if a sublease, such subletting shall be for a term ending no later than one day prior to the Expiration Date of this Lease; or (H) such sublease shall fail to provide that it is subject and subordinate to this Lease and to the matters to which this Lease is or shall be subordinate, and that in the event of termination, re-entry or dispossess by Owner under this Lease may, at its option, take over all of the right, title and interest of Tenant, as sublessor, under such sublease, and such subtenant shall, at Owner's Option, attorn to Owner pursuant to the then executory provisions of such sublease, except that Owner shall not be liable for any previous act or omission of Tenant under such sublease, be subject to any offset, which theretofore accrued to such subtenant against Tenant, or be bound by any previous modification of such sublease or by any previous prepayment of more than one month's rent;

(iv)   Tenant shall not then be in default after notice, if required, and expiration of any applicable cure period in the performance of any obligations on its part to be performed hereunder.

(v)   On or prior to the granting by Owner of its consent: (A) Tenant shall deliver to Owner an executed duplicate original of the assignment or sublease (which, in the case of a sublease, shall prohibit any subleasing or assignment by the subtenant without with the prior consent of Owner); (B) the assignee shall execute and deliver to Owner an assumption agreement whereunder the assignee agrees to assume, perform and be bound by all covenants, agreements and conditions on the part of Tenant to be observed and performed under this Lease; (C) at the request of Owner, Tenant and the assignee or sublessee shall enter into a consent or three party agreement with respect to such assignment or sublease in form and substance reasonably satisfactory to Owner, (D) the guarantor of this Lease, if any, shall deliver an original executed and acknowledged affirmation of guaranty, in form and substance satisfactory to Owner, stating that said guaranty remains in full force and effect in accordance with its terms, notwithstanding said assignment or sublease, which shall be consented to by said guarantor; (E) if, in the case of an assignment of this Lease, the assignee is a partnership, corporation or other entity, then all of the beneficial owners thereof shall execute, acknowledge and deliver a guarantee of this Lease in form and substance satisfactory to Owner; (F) if the assignee or subtenant is a corporation, the principals of the assignee or subtenant shall execute and deliver to Owner personal guarantees in form and substance satisfactory to Owner; (G) Tenant shall pay or reimburse Owner for all reasonable attorney's fees and disbursements incurred by Owner in connection with such assignment or sublease; and (H) or in lieu of requiring the guarantees under clauses (E) and (F) above, the assignee or, in the case of a sublease, Tenant, shall deliver to Owner additional security to be added to the Security Deposit in an amount determined by Owner in Owner's sole discretion, which security shall not exceed four (4) months rent and additional rent under this Lease and which shall be held by Owner in accordance with the provisions of Articles 34 and 54.

(vi)   Owner shall respond to a request for approval of a proposed assignment of this Lease or a proposed subleasing by Tenant of all of either Suite 1 or Suite 2 (but not a portion of either one of them) within thirty (30) days after Owner's receipt of the foregoing documents and information. If Owner shall fail to respond to Tenant within said thirty

(30) day period, Owner shall be deemed to have approved such transaction, provided that Tenant have sent Owner a second request for approval containing the following language in bold print and Ownershall again have failed to respond within the time period set forth therein: "THIS IS A SECOND REQUEST FOR APPROVAL OF THE PROPOSED [ASSIGNMENT] OR [SUBLETTING]. IF OWNER DOES NOT RESPOND TO THIS REQUEST WITHIN FIVE (5) BUSINESS DAYS, OWNER'S APPROVAL SHALL BE DEEMED GRANTED PURSUANT TO THE PROVISIONS OF THE LEASE."

(b) If at any time during the term of this Lease Tenant shall be a partnership, corporation, trust, entity or other than a natural person, then the transfer during the term of this Lease of more than forty-nine percent (49%) in the aggregate of the beneficial ownership of Tenant or the issuance of any additional shares or partnership interests to the extent of more than forty-nine percent (49%) in the aggregate of the beneficial ownership of Tenant hereunder, any merger, consolidation or combination of Tenant with any other entity or any transfer of this Lease by operation of law or otherwise shall constitute an assignment of this Lease and, unless in each instance the prior written consent of Owner has been obtained, shall constitute a default under this Lease and shall entitle Owner to exercise all rights and remedies provided for herein in the case of default.

(c) Notwithstanding anything to the contrary contained in this Lease, if Tenant requests and Owner grants its consent to any assignment of this Lease or to any subletting of all or any part of the demised premises (including for such purposes any portions of the demised premises then subject to a sublease), (other than an assignment of Tenant's entire interest in this Lease in connection with a sale of Tenant's retail business as described in Article 51(a)(i)) then Tenant shall pay to Owner one-half (½) of the Assignment Profit or Subletting Profit (each as hereinafter defined) as the case may be. The Subletting Profit or the Assignment Profit shall be paid by Tenant to Owner as and when paid to Tenant. "Subletting Profit" shall mean in any year of the term of this Lease (i) any rents, additional charges or other consideration payable under the sublease, and any related documents or transactions which is in excess of the fixed annual rent and additional rent accruing during such year of the term of this Lease pursuant to the terms hereof in respect of the portion of the demised premises subleased pursuant to such sublease after deducting Tenant's reasonable and customary costs of preparing the space, free rent periods, advertising and brokerage commissions related to such subletting; (ii) all sums paid for the sale or rental of Tenant's fixtures, leasehold improvements, equipment, furniture or other personal property, less, in the case of the sale thereof, the then net unamortized or undepreciated cost thereof determined on the basis of Tenant's federal income tax returns, which net unamortized amount shall be deducted from the sums paid in connection with such sale in equal monthly installments over the balance of the term of the sublease (each such monthly deduction to be in an amount equal to the quotient of the net unamortized amount, divided by the number of months remaining in the term of this Lease) and (iii) all sums paid for services provided by Tenant or any affiliate of Tenant to subtenant or any affiliate of subtenant in excess of the fair market value for such services. "Assignment Profit" shall mean an amount equal to all sums in excess of Tenant's reasonable and customary costs of preparing the space, advertising and brokerage commissions related to such assignment and other considerations paid to Tenant or any affiliate of Tenant by the assignee or any affiliate of the assignee for or by reason of such assignment and any related documents or transactions (including, but not limited to, sums paid for the sale or rental of Tenant's fixtures, leasehold improvements, equipment, furniture, furnishings or other personal property, less, in the case of a sale thereof, the then net unamortized or undepreciated cost thereof determined on the basis of Tenant's federal income tax returns).

(d) Notwithstanding anything to the contrary contained in this Lease, if Tenant requests the consent of Owner to: (A) any assignment of this Lease other than to an assignment of Tenant's entire interest in this Lease in connection with a sale by Tenant of Tenant's retail business as described in Article 51(a)(i) or (B) any subletting of all or any part of the demised premises (including for such purposes any portions of the demised premises then subject to a sublease) for all or substantially all of the unexpired term of this Lease (excluding any unexercised renewal options); then, in any such event, Owner shall have the right, in lieu of giving such consent or refusing to consent to such a proposed assignment or sublease, to elect, by notice given to Tenant within thirty (30) days after Owner's receipt of Tenant's request to assign this Lease or to sublet, either: (1) to terminate this Lease (which termination shall, unless Owner elects otherwise, operate to terminate any subleases then in effect) as to the demised premises or the relevant portion thereof or (2) to require Tenant to assign this Lease or sublet the demised premises or the applicable portion thereof (the "Leaseback Space") instead to Owner or Owner's

designee. If Owner so elects then if Owner shall have elected to terminate this Lease, then this Lease shall terminate on the date specified in such notice, which date shall be not earlier than the earlier of thirty (30) days after the date on which such notice is given or the effective date of the proposed assignment or sublease for which Owner's consent was requested, as if such date were the day herein fixed for expiration of this Lease. If Owner shall have elected either option (1) or (2) above, Owner (or Owner's designee, as the case may be) shall have the right thereafter, without liability to Tenant, to enter into a lease or sublease (as the case may be) of the demised premises to Tenant's proposed assignee or subtenant.

(e) If this Lease be assigned, whether or not in violation of the provisions of this Lease, Owner may collect rent from the assignee. If the demised premises or any part thereof are licensed, sublet or used or occupied by anybody other than Tenant, whether or not in violation of this Lease, Owner may collect rent from the subtenant or occupant. In either event, Owner may apply the net amount collected to the fixed annual rent and additional rent herein reserved, but no such assignment, subletting, occupancy or collection shall be deemed a waiver of any of the provisions of this Lease, or the acceptance of the assignee, subtenant, licensee or occupant as tenant, or as a release of Tenant from the performance by Tenant of Tenant's obligations under this Lease. The consent by Owner to any assignment, mortgaging, subletting, licensing or use or occupancy by others shall not in any way be considered to relieve Tenant from obtaining the express written consent of Owner to any other or further assignment, mortgaging or subletting or use or occupancy by others not expressly permitted by this Article.

(f) Tenant covenants that, notwithstanding any assignment, subletting or transfer, whether or not in violation of the provisions of this Lease, and notwithstanding the acceptance of fixed annual rent and/or additional rent by Owner from an assignee, subtenant, transferee, licensee, or any other party, Tenant shall remain fully and personally liable for the, payment of the fixed annual rent and additional rents and for the other obligations of this Lease on the part of Tenant to be performed or observed. Any violation of any provision of this Lease by any assignee, subtenant or other occupant shall be deemed a violation by the original Tenant named herein, the then subtenant or assignee and any other persons who at any time was or were subtenant or assignee, it being the intention and meaning that the original Tenant named herein, the then subtenant or assignee and any other person(s) who at any time was or were subtenant or assignee shall all be liable to Owner (to the extent that any liability theretofore existed) for any and all acts and omissions of any and all assignees, subtenants and other occupants of the demised premises.

(g) The joint and several liability of Tenant and any immediate or remote successor in interest of Tenant and the due performance of the obligations of this Lease on Tenant's part to be performed or observed shall not be discharged, released or impaired in any respect by any agreement or stipulation made by Owner extending the time of, or modifying any of the obligations of this Lease, or by any waiver or failure of Owner to enforce any of the obligations of this Lease.

(h) Tenant shall not: (i) advertise or publish the availability of all or any part of the demised premises without the prior approval of Owner, which approval shall not be unreasonably withheld, and any advertisement or publicity shall not state the name (as distinguished from the address) of the Building or the proposed rental; (ii) list all or any part of the demised premises at a rental rate less than the greater of:  (A) the fixed annual rent and additional rent then payable for such space under this Lease or (B) the fixed annual rent and additional rent at which Owner is then offering to lease other space in the Building; or (iii) assign this Lease or sublet all or any part of the demised premises to or propose to do so to any tenant or occupant of any space in the Building, any person or entity with whom Owner is then or has within the preceding six (6) months negotiated to lease space in the Building, or any entity controlling, controlled by or under common control with any of the foregoing.

(i) Provided Tenant is not in default hereunder after notice, if required, and expiration of any applicable cure period, Owner shall not unreasonably withhold its consent to the granting by Tenant of up to two (2) licenses of portions of the demised premises:  (i) to experienced individuals for the use permitted in Articles 2 and 58 of this Lease, (ii) for not more than an aggregate of thirty percent (30%) of the demised premises at any time, (iii) to not more than two (2) licensees (whose names and addresses shall have previously been furnished by Tenant to Owner together with such other information and references as Owner may reasonably require) at any one time, and (iv) pursuant to a license agreement in form and substance

satisfactory to Owner. Notwithstanding anything contained herein to the contrary, the provisions of Article 51(c) shall be applicable to any such license. Nothing hereunder shall be deemed to give any licensee or other occupant any right, title or interest in or to the demised premises.

52. Tenant's Signs.

(a) Tenant shall not install in the demised premises or on or in any portion of the Building or any interior entry way or the street windows, any exterior or interior signs, awnings, gates, projections, advertisements, notices, nameplates or lettering (including any changes thereto); except that Tenant shall have the right to display a single dignified building standard professional sign on the exterior of the Building provided that the location, size, type and material thereof shall be reasonably satisfactory to Owner and consistent with the signage existing in the Building. Tenant shall not permit any other window treatment other than those window blinds provided to the demised premises by Owner to be visible from the exterior of the Building without Owner's prior written consent. Tenant shall not have the right to install an awning on the exterior of the Building. Tenant agrees to discontinue immediately after demand by Owner, and as often as such demand shall be made, the exhibition or advertisement in or with respect to the demised premises or any part thereof of any article or material or the manner of exhibition or advertisement of same to which Owner shall object. Tenant acknowledges that Owner's damages resulting from any breach of the provisions of this Article 52 are difficult, if not impossible, to ascertain and concedes that, among other remedies for such breach permitted by law or the provisions of this Lease, Owner shall be entitled to enjoin Tenant from any violation of said provisions.

(b) Any displays in the Display Zone (as hereinafter defined) will be attractive and professionally designed and in compliance with the Building Rules and Building Standards for Alterations and subject to the approval of Owner, which approval shall not be unreasonably withheld or delayed. Notwithstanding the foregoing, Tenant shall have the right to display jewelry in a "Tiffany Style" in the Display Zone. Except as set forth in the immediately preceding sentence, all articles, and the arrangement, style, color and general appearance thereof, in the interior of the demised premises, including, without limitation, window displays, advertising matter, signs, merchandise and store fixtures, shall be in keeping with the character and first class standards of the Building as reasonably determined by Owner. Owner reserves the right to (a) require Tenant to correct any nonconformity, which Tenant shall do within ten (10) days after written notice from Owner, or (b) work with a professional display decorator selected by Owner in consultation with Tenant, the cost of which shall be paid by Tenant. If Tenant fails to correct any such nonconformity, Owner shall have the right to enter the demised premises upon reasonable written notice and remove any items causing the nonconformity. "Display Zone" means the area within eighteen inches (18") of the glass windows of the demised premises adjacent to Fifth Avenue.

53. Air-Conditioning and Ventilation.

(a) Owner shall not be responsible for providing air-conditioning ("HVAC") to the demised premises but rather will supply condenser water to the extent condenser water services Suite 1 or Suite 2 as of the date of this Lease. Tenant shall have the right to install individual HVAC units, at Tenant's expense, subject to Owner's prior written approval, which consent shall not be unreasonably withheld.

(b) Supplementing Articles 4 and 29 hereof, if Tenant requests condenser water outside of Regular Business hours (as hereinafter defined), such condenser water shall be supplied by Owner, at Owner's then standard charge therefore, payable monthly as additional rent hereunder. "Regular Business Hours" shall mean 8 a.m. to 6 p.m. on Monday through Friday, holidays excepted, and on Sunday from 9 a.m. to 5 p.m. Tenant shall give Owner prior reasonable notice of its intent to use the condenser water outside of Regular Business Hours.

(c) Owner shall not be responsible for any failure to supply air-conditioning at reasonable temperatures, pressures or degrees of humidity or in reasonable volumes or velocities in any room or other area of the demised premises which has an electrical load in excess of four (4) watts per square foot by reason of any machinery, lighting or equipment installed therein, or which has a human occupancy factor in excess of one (1) person per one hundred (100) usable square feet. Tenant agrees to cause all windows in the demised premises to be kept closed at all times during which the HVAC unit is turned on and Tenant agrees to cooperate fully with Owner

at all times and to abide by all regulations and requirements which Owner may reasonably prescribe for the proper functioning and protection of said air-conditioning system. In the event of a violation by Tenant of any of the foregoing provisions of this Article 53, Owner shall have the right, without prejudice to any other rights it may have, to discontinue said air conditioning service during the period of such violation without abatement of rent to Tenant.

(d) Owner reserves the right at any time and from time to time to interrupt or discontinue service of condenser water and ventilating systems, without liability to Tenant, when necessary by reason of accident or emergency or for the making of repairs, alterations, replacements or improvements which in the judgment of Owner are necessary or desirable, or by reason of any laws, orders or regulations of any municipal or other governmental authority or any other cause beyond Owner's control, provided that Owner shall perform such work in a way as to minimize any interference with the Tenant's business.

(e) Tenant may use the existing heating, air-conditioning and/or ventilating system; provided, however that: (i) Tenant, and not Owner, shall be solely responsible for maintaining, repairing or replacing same to the extent desired by Tenant and (ii) Tenant acknowledges that Owner has made no representations or warranties with regard to same.

54. Security Deposit. (a) Supplementing the provisions of Article 34 hereof, if Tenant defaults in the full and prompt payment and performance of any of Tenant's covenants and obligations under this Lease including, but not limited to, the payment of fixed annual rent and/or additional rent, Owner may use, apply or retain the whole or any part of the security required under Article 34 and this Article 54(a) and the interest, if any, accrued thereon (collectively, the "Security Deposit") to the extent required for the payment of any fixed annual rent and additional rent or any other sums as to which Tenant is in default or for any sum which Owner may expend or may be required to expend by reason of Tenant's default in respect of any of the terms, covenants and conditions of this Lease including, but not limited to, any damages or deficiency in the reletting of the demised premises, whether such damages or deficiency accrue before or after summary proceedings or other re-entry by Owner. If Owner shall so use, or retain the whole or any part of the Security Deposit, Tenant shall upon demand immediately deposit with Owner a sum equal to the amount so used, applied or retained, as security as aforesaid, failing which Owner shall have the same rights and remedies as for the non-payment of fixed annual rent. In the event of a transfer of Owner's interest in the Building, Owner shall have the right to transfer the Security Deposit to the transferee and thereupon the Owner shall, without any further agreement between the parties, be released by Tenant from all liability therefor and it is agreed that the provisions hereof shall apply to every transfer or assignment of said Security Deposit to a new Owner.

(b) Tenant shall have the right in lieu of a cash Security Deposit to deliver a letter of credit (as amended, and replaced, the "Letter of Credit"). The Letter of Credit shall be: (i) in the amount of the Security Deposit (rounded up to the nearest $1,000); (ii) an irrevocable, unconditional, transferable letter of credit in form and content satisfactory to Owner; (iii) issued by a member of the New York Clearinghouse Association; (iv) expiring not earlier than twelve (12) months after the date of delivery thereof to Owner and providing that same shall be automatically renewed for successive twelve (12) month periods through a date which is not earlier than ninety (90) days after the Expiration Date unless written notice of non-renewal has been given by the issuing bank to Owner and its attorneys as provided in Article 68 not less than sixty (60) days prior to expiration of the then current period; (v) conditioned for payment solely upon presentation of a sight draft; (vi) specifying that same may not be amended (except to extend its expiration date) without the prior written consent of Owner; and (vii) otherwise reasonably satisfactory to Owner in all respects. The Letter of Credit shall be delivered by Tenant to Owner and a copy thereof shall be simultaneously delivered by Tenant to the attorney for Owner. If: (A) there shall be a default by Tenant under this Lease which is not cured after notice, if required, and within the applicable cure period, if any, or (B) the Letter of Credit shall expire prior to a date which is earlier than ninety (90) days after the Expiration Date (unless not later than 30 days prior to the expiration date of the Letter of Credit, the Letter of Credit shall have been amended to extend its expiration date to a date at least twelve (12) months thereafter or replaced with a Letter of Credit complying with the provisions of this Article 54(c), and having an expiration date at least twelve (12) months thereafter), Owner shall have the right to demand and to receive from the issuing bank the funds provided for in the Letter of Credit and such funds shall become the Security Deposit and may be applied to cure such default as provided in this Lease. Tenant covenants that it will not assign or encumber the Letter of Credit

or any part thereof and that neither Owner nor its successors or assigns will be bound by any such assignment, encumbrance, attempted assignment or attempted encumbrance. In the event that Tenant shall fully comply with all of the terms, provisions, covenants and conditions of this Lease, the Letter of Credit shall be surrendered to Tenant promptly after the Expiration Date.

(c) Notwithstanding anything to the contrary contained in this Lease, Tenant shall within fifteen (15) days after the date of this Lease deliver to Owner either a cash security deposit or the Letter of Credit in the form required by Section 54(b) above. In the event Tenant fails to deliver a cash deposit or the Letter of Credit within such fifteen (15) day period, then this Lease shall be deemed void *ab initio*, at Owner's option, upon notice to Tenant at any time thereafter. In the event Owner shall send such notice to Tenant as previously provided, the term hereof shall cease and expire upon the giving of such notice as if such date were expressly set forth as the Expiration Date of this Lease and Owner shall have the right to lease the demised premises to another tenant, licensee or occupant.

55. Water Charges. As long as Tenant is not in default under any of the covenants of this Lease, Owner shall provide water to the demised premises for ordinary lavatory purposes, but if Tenant uses or consumes water for any other purposes or in unusual quantities (of which fact Owner shall be the sole judge), Owner may, at any time, install a water meter at Tenant's expense which Tenant shall thereafter maintain in good working order and repair to register such water consumption and Tenant shall pay for all water consumed as shown on said meter and the cost of reading the meter as additional rent as and when bills are rendered, and on Tenant's default in making such payment, Owner may pay such charges and collect the same from Tenant.

56. Casualty. Supplementing the provisions of Article 9 hereof, within forty-five (45) days after notice to Owner of any such damage, Owner shall deliver to Tenant an estimate prepared by a reputable contractor selected by Owner setting forth such contractor's estimate as to the reasonable time required to repair such damage. If the time period set forth in such estimate exceeds one year, Tenant may elect to terminate this Lease by notice to Owner not later than ten (10) business days following the delivery of such estimate to Tenant. If Tenant makes such election, the term of this Lease shall expire upon the twentieth (20th) day after notice of such election is given by Tenant, and Tenant shall vacate the demised premises and surrender the same to Owner. Upon such termination, Tenant's liability for fixed annual rent shall cease as of the day following such damage, and any prepaid portion of fixed annual rent or additional rent for any period after such date shall be refunded by Owner to Tenant. If Tenant fails to make such election and if, for any reason whatsoever, Owner fails to repair the demised premises within the period set forth in such estimate, Owner shall not be liable to Tenant for such failure and Tenant shall have no further options to cancel this Lease under Article 9 or under this Article 56. Notwithstanding the foregoing, if any material (which shall be deemed to be taking more than three (3) months to repair as estimated by Owner in its reasonable judgment) damage or destruction to the demised premises shall occur during the last year of the Term, this Lease may be terminated either at Tenant's or Owner's election upon at least thirty (30) days' prior written notice. In such case, this Lease and the Term hereof shall cease and come to an end as to the date set forth in such termination notice (provided such date is at least thirty (30) days after the date of the termination notice), and all insurance proceeds paid with respect to the leasehold improvements constructed by Tenant in the Premises from time to time (including any additions, replacements or renovations thereto) shall be paid to Owner, and any insurance proceeds payable with respect to Tenant's personal property, and Tenant's fixtures and equipment shall be paid to Tenant. Nothing in this Section 56 shall be deemed to supersede the provisions of Article 9 with respect to the abatement of rent in connection with a casualty.

57. Owner's Alterations. Supplementing the provisions of Articles 4, 13 and 20, Owner shall use reasonable efforts not to unreasonably interfere with the conduct of Tenant's business in connection with alterations, additions and improvements to the Building and repairs, alterations, replacements or improvements of the heating, elevator, plumbing, electric or other systems or elements of the Building, but in no event shall Owner be required to engage workers or contractors at overtime rates. Owner agrees not to voluntarily block the entrance to the demised premises, and if required to temporarily block the entrance by applicable law, Owner will provide alternative access to the demised premises until access through the entrance to the demised premises is restored. In the event Owner erects a sidewalk bridge or scaffolding over the entrance of the demised premises, Owner agrees to erect signage identifying Tenant's business, to the extent permitted and in accordance with applicable laws.

58. <u>Use and Occupancy</u>.

Supplementing the Provisions of <u>Article 2</u> of this Lease:

(a) Tenant shall only use, occupy, operate and maintain the demised premises throughout the term of this Lease as a gallery for the display of high quality diamond jewelry and in a high grade and reputable manner and in a manner which shall not detract from the character, appearance or dignity of the Building and for no other purpose. Tenant shall not: (i) conduct or permit any fire, auction, going-out-of-business or bankruptcy sale in the demised premises; (ii) engage in any unethical method of business operation; (iii) use or permit to be used the common areas, corridors or other space outside the demised premises for any display, sale or similar undertaking or storage except Tenant may use the outdoor courtyard space on a non-exclusive basis with other tenants in the Building; (iv) use or permit to be used any loudspeaker, phonograph or other sound system or advertising device which may be heard outside the demised premises; or (v) distribute or permit to be distributed handbills or other matter to customers outside the demised premises. Tenant acknowledges that Owner's damages resulting from any breach of the provisions of this <u>Article 58</u>, or of <u>Articles 2, 37, 43, 47, 51, 52, 71, 72, 74 and 75</u> hereof, are difficult, if not impossible, to ascertain and concedes that, among other remedies for any such breach permitted by law or the provisions of this Lease, Owner shall be entitled to enjoin Tenant from any violation of said provisions. Tenant acknowledges that the outdoor courtyard space is not a part of the demised premises. In addition to the right to use the courtyard set forth in clause (iii) above, and provided Tenant is not in default under this Lease, Tenant shall have the right to use the outdoor courtyard space for events not more than four (4) times per calendar year subject to the following conditions: (w) Tenant shall provide Owner with at least thirty (30) days' prior notice, (x) no event shall be of a duration in excess of three (3) hours, or end later than 8:00 p.m., (y) no additional artificial lighting may be placed in the courtyard, and (z) no alcohol may be served and no live or audible music may be played at any such event. Tenant further acknowledges that Tenant may not prevent any other tenant in the Building from accessing the courtyard during any such event and Tenant may not block, lock or otherwise impede access to the courtyard from the Building.

(b) Tenant shall not at any time use or occupy the demised premises, or suffer or permit anyone to use or occupy the demised premises, or do anything in or about the demised premises, or suffer or permit anything to be done in or about, brought into or kept on or about the demised premises, which: (i) violates the CO (as hereinafter defined) for the demised premises or the Building, or for the Building; (ii) causes or is liable to cause injury to the demised premises or the Building or any equipment, facilities or systems therein; (iii) constitutes a violation of the laws and requirements of any public authorities or the requirements of any insurance bodies; (iv) impairs the proper and economic maintenance, repair and operation of the Building and/or its equipment, facilities or systems; (v) annoys or inconveniences or tends to annoy or inconvenience other tenants or occupants of the Building; (vi) constitutes a nuisance, public or private; (vii) makes fire, extended coverage, liability or any other insurance unobtainable from reputable companies authorized to do business in New York at standard rates (unless Tenant pays any excess over standard rates); (viii) impairs or tends to impair the character, reputation or appearance of the Building as a first-class residential building with professional office space; (ix) violates any of Tenant's other obligations under this Lease; (x) materially increases the traffic within the demised premises or the Building; or (xi) causes the demised premises and/or all or any part of the Building to constitute or potentially constitute a "place of public accommodation" under the Americans with Disabilities Act of 1990 except that if the demised premises and/or all or any part of the Building shall, as a direct or indirect result of Tenant's manner of use or occupancy of the demised premises causes all or part of the demised premises or all of part of the Building to constitute "a place of public accommodation" under the Americans with Disabilities Act of 1990, any amendments or regulations promulgated thereunder or any related or similar law, then Tenant shall be solely responsible for causing the demised premises to comply therewith and, upon request from Owner, reimbursing Owner for the cost of causing the Building to comply therewith. Owner agrees during the term of this lease not to voluntarily further restrict the permitted use for the demised premises set forth on the CO. In addition, provided: (i) Tenant is not in default under this lease; (ii) Tenant is using the demised premises solely for the purpose set forth in Section 58A; and (iii) a governmental authority (or other similar entity with jurisdiction over the demised premises) has not made a claim that Tenant's use of the premises is in violation of applicable laws, Owner agrees not to voluntarily commence an action to terminate this lease based on Tenant's use of the demised premises.

(c) If any governmental license or permit (other than the CO), shall be required for the proper and lawful conduct of Tenant's business in the demised premises or any part thereof, Tenant, at its expense, shall duly procure and thereafter maintain such license or permit and submit a true and complete copy thereof to Owner when obtained. Tenant shall at all times comply with the terms and conditions of each such license or permit. Additionally, should Tenant's Work or Tenant's use of the demised premises require any modification or amendment of any application filed for the renovation of the Building or any CO for the Building, Tenant shall, at its expense, take all actions requested by Owner in order to procure any such modification or amendment and shall reimburse Owner (as additional rent hereunder) for all costs and expenses Owner incurs in effecting said modifications or amendments. The foregoing provisions are not intended to be deemed Owner's consent to any Tenant's Work or to a use of the demised premises not otherwise permitted hereunder nor to require Owner to effect such modifications or amendments to any such application or any CO.

(d) Tenant shall exercise reasonable diligence in preparing the demised premises for the use described in Article 2 and this Article 58 and shall open the demised premises for the ordinary conduct of the business described in that article as soon as is reasonably practicable after the Commencement Date.

(e) Tenant shall not use, or suffer or permit anyone to use, all or any part of the demised premises for any of the following or any similar activity: (i) the business of photographic reproductions and/or offset printing (except that Tenant may use part of the demised premises for photographic reproductions and/or offset printing for Tenant's own business); (ii) an agency, department or bureau of the United States Government, any state or municipality within the United States or any foreign government, or any political subdivision of any of the foregoing; (iii) an employment agency, a public stenographer, typist or word processor, telephone or secretarial service, travel or tourist agency, public vending machines or games, school or classroom, advertising agency, real estate brokerage or the rental or desk or office space; (iv) any union or religious organization; (v) any charitable or other not-for-profit organization; or (vi) retail securities brokerage or banking.

(f) Tenant agrees that it will not: (i) perform any treatments or procedures requiring the use of any odorous chemicals and no odorous anesthetics will be given in the demised premises, which will permeate beyond the demised premises, or (ii) cause any vibrations, noise or other disturbance which would interfere with the use of the building by any other tenant or extend beyond the demised premises, including, without limitation, interference with television and radio equipment or the generation of radio frequency radiation and/or electromagnetic radiation.

(g) All customers, invitees and employees of Tenant shall enter the demised premises through the street entrance directly into the demised premises, if any, or through the existing separate street entrance known as 800-B Fifth Avenue, and not through the public residential lobby entrance known as 800 Fifth Avenue.

(h) Notwithstanding anything to the contrary contained in this Lease it is agreed that (i) neither Owner nor anyone else has made any representation or warranty regarding whether or not the Tenant's proposed use or proposed occupancy complies with the Building's certificate of occupancy (the "CO"), a copy of which is attached hereto as Exhibit B or Laws (as defined hereinafter), (ii) this Lease shall remain in full force and effect and Tenant shall remain obligated to comply with all its terms and conditions thereof even if Tenant's proposed occupancy and/or proposed use of the demised premises violates the CO or applicable Laws, (iii) Owner shall have no obligation whatsoever to amend the CO, seek a variance or make any renovations, changes or improvements in or to the demised premises or make the demised premises or its use conform with the CO and Tenant shall not seek a variance or make any renovations, changes or improvements in or to the demised premises or make the demised premises or its use conform with the CO or Laws, without Owner's consent, and (iv) Tenant shall be in material default under this Lease if Tenant's proposed use or occupancy violates the CO or applicable Laws. "Laws" shall mean all present and future statutes, laws, rules, rulings, orders, regulations, ordinances, judgments, decrees and injunctions including, without limitation, fire, health, handicapped access, sanitation, ecological, historic, landmark, zoning, environmental protection, wetlands and building laws) now or hereafter in effect and directions of all state, federal, municipal and local governments, departments, commissions and boards and the State Board of Fire Underwriters, or the Insurance Services Office or any similar body. Owner agrees

not to voluntarily amend the CO so as to change the permitted use for the demised premises as of the date of this Lease.

59. Holidays. The term "business days" wherever used in this Lease shall be deemed to exclude all Federal holidays, State holidays and holidays celebrated by the unions governing employees of the Building, all of which holidays are sometimes referred to in this Lease as "holidays".

60. Public Areas. Owner shall have the right at any time, without the same constituting an eviction of Tenant or entitling Tenant to any abatement of rent, and without otherwise incurring any liability to Tenant, to change the arrangement and/or location of (including the closing off of) public entrances, passageways, doors, doorways, corridors, elevators, stairs, toilets or other public parts of the Building, provided that in so doing, Owner does not deny Tenant or Tenant's patients, visitors and employees reasonable means of access to the demised premises (and the courtyard space).

61. Energy Conservation. Tenant understands that both Owner and Tenant may from time to time be required to comply with directives of governmental authorities and/or the public utility company serving the Building for the purpose of conserving energy. The parties agree that each will and shall be obligated to comply with all such directives. In no event shall Tenant be entitled to any abatement of rent or to claim a constructive eviction, nor shall Owner otherwise incur any liability to Tenant, by reason of Owner's compliance with any such directives.

62. Multiple Defaults. Notwithstanding any provision in this Lease permitting Tenant to cure any default within a specified period of time, if Tenant shall default: (a) in the timely payment of rent or additional rent, and such default shall continue or be repeated for two (2) consecutive months or for a total of three (3) months in any period of twenty-four (24) months, or (b) in the performance of any particular term, condition or covenant of this Lease more than three (3) times in any period of twenty-four (24) months, then, in either of such events and notwithstanding that such defaults shall have been cured within the grace period and/or after notice, if any, as provided in this Lease: (i) any further similar default shall be deemed to be deliberate and Owner thereafter may serve a written ten day notice of termination of this Lease upon Tenant without affording to Tenant an opportunity to cure such further default, and (ii) Owner shall thereafter have the right to require the deposit of security or additional security pursuant to Articles 34 and 54 such that the amount of the Security Deposit (and the Minimum Security Amount) then held by Owner is increased to the greater of: (A) one-half (1/2) of the fixed amount rent and additional rent payable under this Lease with respect to such calendar year or (B) double the amount of the Security Deposit then held by Owner. In addition to any other remedies provided for in this Lease, whether or not Owner shall have collected any monthly Deficiency, Tenant shall pay to Owner, on demand, in lieu of any further Deficiency and as liquidated and agreed final damages, a sum equal to the amount by which the Rent for the period which otherwise would have constituted the unexpired portion of the term (with both amounts being discounted to present value at a rate of interest equal to four percent (4%) per annum) less the aggregate amount of Deficiencies theretofore collected by Owner pursuant to the provisions of this Lease, including, without limitation, Article 18 of the printed portion of the lease, for the same period. If, before presentation of proof of such liquidated damages to any court, commission or tribunal, the demised premises, or any part thereof, shall have been relet by Owner to an unaffiliated party for the period which otherwise would have constituted the unexpired portion of the term, or any part thereof, the amount of rent reserved upon such reletting shall be deemed prima facie, to be the fair and reasonable rental value for the part or the whole of the Premises so relet during the term of the reletting. For purposes of this Article 62, the term "Deficiency" shall mean the difference between (a) the fixed rent and additional rent for the period which otherwise would have constituted the unexpired portion of the term, and (b) the net amount, if any, of rents collected under any reletting effected pursuant to the provisions of the lease for any part of such period (after first deducting from such rents all expenses reasonably incurred by Owner in connection with the termination of this Lease, Owner's re-entry upon the demised premises and such reletting, including repossession costs, brokerage commissions, attorneys' fees and disbursements, and alteration costs).

63. End of Term. Tenant acknowledges that possession of the demised premises must be surrendered to Owner at the expiration or sooner termination of the term of this Lease with any safe or similar heavy equipment removed, and with all display cases (that are not built-in),

Tenant's trade fixtures, Tenant's equipment and personal property removed from the demised premises. Tenant hereby indemnifies and saves Owner harmless against all costs, claims, loss or liability resulting from delay by Tenant in so surrendering the demised premises including, without limitation, any claims made by any succeeding tenant founded on such delay. The parties recognize and agree that the damage to Owner resulting from any failure by Tenant timely to surrender possession of the demised premises as aforesaid will be extremely substantial, will exceed the amount of the monthly rent and additional rent theretofore payable hereunder, and will be impossible accurately to measure. Tenant therefore agrees that if possession of the demised premises is not surrendered to Owner on or before the date of the expiration or sooner termination of the term of this Lease, then Tenant shall pay to Owner as liquidated damages for each month without proration and for each portion of any month during which Tenant holds over in the demised premises after the expiration or sooner termination of the term of this Lease, a sum equal to one and one half (1½) times the aggregate of the fixed annual rent and additional rent which was payable under this Lease with respect to the last month of the term for the first two (2) months of Tenant's holdover and thereafter. Nothing herein contained shall be deemed to permit Tenant to retain possession of the demised premises after the expiration or sooner termination of the term of this Lease. The provisions of this Article shall survive the expiration or sooner termination of the term of this Lease. Tenant shall have the right to place a 'new location' sign in form, content and size reasonably acceptable to Owner in the window of the premises for a period of thirty (30) days after the end of the term provided that a new tenant has not taken possession of the premises.

64. <u>Rent Control</u>. If at any time or times during the term of this Lease, the rents reserved in this Lease shall not be fully collectible by reason of any Federal, State, County or City law, proclamation, order or regulation, or direction of a public officer or body pursuant to law, Tenant shall enter into such agreements and take such other steps (without additional expense to Tenant) as Owner may reasonably request and as may be legally permissible to permit Owner to collect the maximum rents which may from time to time during the continuance of such legal rent restriction be legally permissible (and not in excess of the amounts reserved therefor under this Lease). Upon the termination of such legal rent restriction prior to the expiration of the term of this Lease: (a) the rents shall become and thereafter be payable hereunder in accordance with the amounts reserved in this Lease for the periods following such termination and (b) Tenant shall pay to Owner, if legally permissible, an amount equal to: (i) the rents which would have been paid pursuant to this Lease but for such legal rent restriction less (ii) the rents paid by Tenant to Owner during the period or periods such legal rent restriction was in effect.

65. <u>No Third-Party Beneficiary</u>. No person, natural or otherwise, is intended or shall be deemed to be a third-party beneficiary of any of the terms of this Lease, it being intended that this Lease be enforceable only by the persons set forth in <u>Article 36</u>.

66. <u>Waiver of Subrogation</u>. (a) Each party hereto shall use its best efforts to include in each of its insurance policies (insuring the Building and Owner's property therein, in the case of Owner, and insuring Tenant's property and business interest in the demised premises, in the case of Tenant, against loss, damage or destruction by fire or other casualty): (i) a waiver of the insurer's right of subrogation against the other Party, (ii) an express agreement that such policy shall not be invalidated if the assured waives the right of recovery against any party responsible for a casualty covered by the policy before the casualty or (iii) any other form of permission for the release of the other party. If such waiver or permission shall not be, or shall cease to be, obtainable without additional charge or at all, the insured party shall so notify the other party promptly after learning thereof. In such case, if the other party shall so elect and shall pay the insurer's additional charge therefor, such waiver or permission shall be included in the policy, or the other party shall be named as an additional assured in the policy. Each such policy which shall so name a party hereto as an additional insured shall contain, if obtainable, agreements by the insurer that the policy will not be cancelled without at least ten (10) days' prior notice to both insureds and that the act or omission of one insureds will not invalidate the policy as to the other assured. Either party so named as an additional insured shall promptly endorse to the order of the other party, without recourse, any instrument for the payment of money under or with respect to the policy of which the other party is the owner or original or primary assured, and shall have no right in or to such payment.

(b) Each party hereto hereby releases the other party with respect to any claim (including a claim for negligence) which it might otherwise have against the other party for loss, damage or destruction with respect to its property (including rental value or business interest)

occurring during the term of this Lease and with respect and to the extent to which it is insured under a policy or policies containing a waiver of subrogation or permission to release liability or naming the other party as an additional assured as provided in Article 66(a). If, notwithstanding the recovery of insurance proceeds by either party for loss, damage or destruction of its property (or rental value or business interest), the other party is liable to the first party with respect thereto or is obligated under this Lease to make replacement, repair or restoration or payment, then provided the first party's right of full recovery under its insurance policies is not thereby prejudiced or otherwise adversely affected, the amount of the net proceeds of the first party's insurance against such loss, damage or destruction shall be offset against the second party's liability to the first party therefor, or shall be made available to the second party to pay for replacements, repair or restoration, as the case may be.

67. Mechanic's Lien. Supplementing Article 3 hereof, if Tenant shall fail to cause any mechanic's lien which has been filed against the demised premises or the Building to be discharged or bonded within thirty (30) days, then, in addition to any other right or remedy of Owner, Owner may bond or discharge the same by paying the amount claimed to be due, and the amount so paid by Owner, including reasonable attorneys' fees incurred by Owner in defending against such lien or procuring the bond or discharge of such lien, shall be due and payable by Tenant to Owner as additional rent.

68. Notices. All notices to Owner shall be personally delivered or sent by overnight courier or by registered mail, return receipt requested and shall be effective upon receipt. All notices to Tenant shall be personally delivered or sent by registered mail, return receipt requested and shall be effective upon receipt. Any notices given by Tenant to Owner shall be effective only if a copy thereof is given at the same time and in the same manner to Mintz Levin Cohn Ferris Glovsky and Popeo, P.C., Chrysler Center, 666 Third Avenue, New York, New York 10017, Attention: Jeffrey A. Moerdler, Esq. and Kriss & Feuerstein LLP, 360 Lexington Avenue, Suite 1200, New York, New York 10017, Attention: David Keusch, Esq. Notices made by the respective attorneys for the tenant and/or Owner shall be effective as notice given for the respective Owner or Tenant.

69. Environmental Compliance. (a) Tenant assumes sole and full responsibility for compliance with all applicable Federal, State and local environmental statutes, regulations and ordinances including, without limitation, all licensing permitting, filing and notification requirements contained therein (collectively, the "Environmental Laws") in respect of the demised premises (including Tenant's permitted use thereof) to the extent the release of which is occasioned by the act, failure to act, negligence or omission of Tenant, its subtenants or licensees, employees, contractors, invitees, guests or agents, and covenants and agrees to indemnify, defend, save and hold Owner harmless, all superior mortgagees and all superior lessors, and their respective partners, directors, officers, agents and employees from and against any and all claims, demands, losses and liability (including reasonable attorneys' fees) resulting from any alleged or actual violation thereof by Tenant or any of its subtenants, licensees or guests or its or their employees, agents or contractors. Tenant assumes sole and full responsibility for all present and future acts or omissions of Tenant or any of its subtenants, licensees or guests or its or their employees, agents or contractors while at, near or on the property containing the demised premises and covenants and agrees to indemnify, defend, save and hold harmless Owner, all superior mortgagees and all superior lessors, and their respective partners, directors, officers, agents and employees, from and against any and all claims, demands, losses and liability (including reasonable attorneys fees) resulting from any alleged or actual violation thereof, including but not limited to personal injury (and death resulting therefrom), property damage, damage to natural resources, and strict liability under the Environmental Laws. The indemnity provided herein shall specifically exclude any violation of Environmental Laws caused by Owner or its agents. The provisions of this Article 69 shall survive the expiration or termination of this Lease.

(b) Tenant shall provide to Owner copies of the following, promptly after each shall have been submitted, prepared or received by Tenant: (a) all applications and associated materials submitted to any governmental authority relating to any Environmental Laws; (b) all notifications, registrations, reports and other documents, and supporting information, prepared, submitted or maintained in connection with any Environmental Laws or relating to environmental conditions at, in, on or under the demised premises; (c) all permits, licenses, approvals, and amendments or modifications thereof, obtained under any Environmental Laws; and (d) any written correspondence, notice of violation, summons, order, complaint, or other

document received by Tenant pertaining to compliance with any Environmental Laws or relating to environmental conditions at, in, on or under the demised premises.

(c) Tenant shall not cause or suffer or permit to occur at, in, on or under the demised premises any generation, use, manufacturing, refining, transportation, emission, release, treatment, storage, disposal, presence or handling of Hazardous Materials (hereinafter defined), except that construction materials (other than asbestos or polychlorinated biphenyls), office equipment, cleaning solutions, and other maintenance materials or materials commonly used in Tenant's trade that are or contain Hazardous Materials may be used, handled or stored on the demised premises in reasonable quantities, if contained in appropriate containers reasonably satisfactory to Owner, provided same is incidental to and reasonably necessary for the construction, operation and maintenance of the demised premises for Tenant's use as permitted hereunder and is in compliance with all Environmental Laws and the terms of this Lease. Should any release of any Hazardous Materials occur at the demised premises in violation of Environmental Laws, Tenant shall immediately contain, remove and dispose of off the demised premises, such Hazardous Materials, and any material contaminated by the release and remedy and mitigate all threats to human health or the environment relating to such release in compliance with Environmental Laws (collectively "Remediation"). Tenant shall retain the services of an environmental engineer and a contractor, both of whom must be approved by Owner, to perform the Remediation and shall submit to Owner for approval the insurance certificates of such engineer and contractor and a written plan for the Remediation. Owner's review and approval shall not relieve Tenant of any obligations hereunder or be construed as an assumption of responsibility or liability by Owner for the choice of engineer or contractor or the contents of any plans or for the Remediation. Owner reserves the right to monitor the Remediation. If Tenant fails to perform the Remediation Owner, at its election, shall have the right to perform the same itself, in which event Tenant shall reimburse Owner, on demand, for all costs incurred by Owner in doing so and complying with all Environmental Laws. Any Remediation performed hereunder shall achieve background levels of contamination.

(d) Tenant agrees to permit Owner and its authorized representatives to enter, inspect and assess the demised premises at reasonable times for the purpose of determining Tenant's compliance with the provisions of this Article 69. Such inspections and assessments may include obtaining samples and performing tests of soil, surface water, groundwater or other media.

(e) Tenant hereby agrees to indemnify, defend and to hold harmless Owner of, from and against any and all expense, loss or liability of any kind or nature suffered by Owner by reason of Tenant's breach of any of the provisions of this Article 69, including, but not limited to, (i) any and all expenses that Owner may incur in complying with any Environmental Laws, (ii) any and all costs that Owner may incur in studying, assessing, containing, removing, remedying, mitigating, or otherwise responding to, the release of any Hazardous Material or waste at, in, on, under or from the demised premises, (iii) any and all costs for which Owner may be liable to any governmental agency for studying, assessing, containing, removing, remedying, mitigating, or otherwise responding to, the release of a Hazardous Material or waste at, in, on, under, from, or relating to Tenant's operations on, the demised premises, (iv) any and all fines or penalties assessed, upon Owner or liabilities to third parties by reason of a failure of Tenant to comply with any obligations, covenants or conditions set forth in this Article 69, and (v) any and all actual and reasonable legal fees and costs incurred by Owner in connection with any of the foregoing.

(f) "Hazardous Materials" means any substances, materials or wastes regulated by any governmental authority or deemed or defined as a "hazardous substance", "hazardous material", "toxic substance", "toxic pollutant", "contaminant", "pollutant", "solid waste", "hazardous waste or words of similar import under applicable legal requirements, including oil and petroleum products, natural or synthetic gas, polychlorinated biphenyls, asbestos in any form, urea formaldehyde, radon gas, or the emission of non-ionizing radiation, microwave radiation or electromagnetic fields at levels in excess of those (if any) specified by any governmental authority or which may cause a health hazard or danger to property, or the emission of any form of ionizing radiation.

(g) The provisions of this Article 69 shall survive the expiration or termination of this Lease.

70. <u>Bankruptcy or Insolvency</u>.   (a)   The filing of a petition by Tenant under the Bankruptcy Code, or the entry of an order for relief against Tenant under the Bankruptcy Code, shall consummate an event of default under this Lease.  In such an event:  If the lease is rejected, Owner shall then immediately be entitled to possession of the demised premises without further obligation to Tenant or the trustee, and this Lease will be cancelled.  Owner's right to be compensated for damages, including, without limitation, all damages described in <u>Article 70(b)</u>, shall survive.

(b) If the trustee of Tenant elects to assume this Lease the assumption may be made only if all of the terms and conditions of this <u>Article 70(b)</u> are satisfied.  To be effective, an assumption of this Lease must be in writing and addressed to Owner and, in Owner's judgment, all of the following conditions, which Owner and Tenant acknowledge to be commercially reasonable, must have been satisfied:

(i)   The trustee has used or has provided to Owner adequate assurance, as defined in this Article, that:  (A) the trustee will cure all monetary defaults and any pecuniary loss (including, without limitation, attorneys' fees, which Tenant agrees constitute an actual pecuniary loss to Owner under this Lease within ten (10) days from the date of the assumption; and (B) the trustee will cure all non-monetary defaults under this Lease within thirty (30) days from the date of assumption.

(ii)   The trustee has provided Owner with adequate assurance of the future performance of each of Tenant's obligations under the lease; including without limitation, that:  (A) The trustee will deposit with Owner, as security for the timely payment of rent, an amount equal to four (4) months rent (as adjusted pursuant to <u>Article 70(c)</u>), additional rent and other monetary charges accruing under this Lease to be held and applied pursuant to <u>Articles 34 and 54</u> of this Lease.  (B) The trustee will pay in advance, on each day that the minimum rent is payable, one twelfth (1/12 of the Tenant's annual obligations under this Lease for escalations, real estate taxes, insurance, and similar charges.  (C) From and after the date of the assumption of this Lease, the trustee will pay, as minimum rent, an amount equal to the sum of the minimum rental otherwise payable under this Lease.  (D) The obligations imposed upon the trustee will continue for Tenant after the completion of the bankruptcy case.

(iii)   Owner has determined that the assumption of the lease will not:  (A) breach any provision in any other lease, mortgage, financing agreement or other agreement by which Owner is bound relating to the Building or (B) disrupt, in Owner's judgment, the tenant mix of the Building or any other attempt by Owner to provide a specific variety of tenants in the Building that, in Owner's judgment would be most beneficial to all of tenants of the Building and would enhance the image, reputation, and profitability of the Building.

(iv)   For purposes of this <u>Article 70</u>, "trustee" shall mean trustee under the Bankruptcy Code or debtor-in-possession or any assignee unless otherwise indicated.  For purposes of this <u>Article 70</u>, "adequate assurance" means that:  (A) Owner will determine that the trustee has, and will continue to have, sufficient unencumbered assets after the payment of all secured obligations and administrative expenses to assure Owner that the trustee will have sufficient funds to fulfill Tenant's obligations under this Lease; or (B) an order will have been entered segregating sufficient cash payable to Owner and/or a valid and perfected first lien and security interest will have been granted in property of Tenant, the trustee, that is acceptable for value and kind to Owner, to secure to Owner the obligation of the trustee or debtor-in-possession to cure the monetary or non-monetary defaults under this Lease within the time periods set forth above.  For the purposes of this provision, adequate assurance of future performance by an assignee of an assumed lease means that Owner has ascertained that each of the following conditions has been satisfied:  (i) the assignee has submitted a current financial statement, audited by a certified public accountant, that shows a net worth and working capital in amounts determined by Owner to be sufficient to assure the future performance by the assignee of Tenant's obligations under this Lease; (ii) if requested by Owner, the assignee will obtain guaranties, in form and substance satisfactory to the Owner, from one or more persons who satisfy Owner's standards of creditworthiness; (iii) the assignee has submitted written evidence, satisfactory to Owner, of substantial experience as a retailer of high end diamond jewelry; and (iv) Owner has obtained all consents or waives from any third party required under any lease, mortgage, financing arrangement, or other agreement by which Owner is bound, to enable Owner to permit the assignment.

(c) When, pursuant to the Bankruptcy Code, the trustee is obligated to pay reasonable use and occupancy charges for the use of all or part of the demised premises, the charges will not be less than the minimum rent as defined in this Lease and other monetary obligations of Tenant for the payment escalations, real estate taxes, insurance, and similar charges.

(d) Tenant's interest in the lease will not pass to any trustee, receiver, assignee for the benefit of creditors, or any other person or entity, or otherwise by operation of law under the laws of any state having jurisdiction of the person or property of Tenant ("state law"), unless Owner consents in writing to this transfer. Owner's acceptance of rent or any other payments from any trustee, receiver, assignee, person, or other entity will not be deemed to have waived, or waive, the need to obtain Owner's consent or Owner's right to terminate this Lease for any transfer of Tenant's interest under this Lease without that consent.

(e) Owner may terminate, at its option, by giving Tenant written notice of this election, this Lease and all of Tenant's rights under this Lease if any of the following events occur: (i) Tenant's estate created by this Lease is taken in execution or by other process of law; (ii) Tenant or any guarantor of Tenant's obligations under this Lease ("guarantor") is adjudicated insolvent pursuant to the provisions of any present or future insolvency law under the laws of any state having jurisdiction; (iii) any cases are filed by or against that guarantor under the Bankruptcy Code or any similar provisions of any future federal bankruptcy law; (iv) a receiver or trustee of the property of Tenant or the guarantor is appointed under the state law by reason of Tenant's or the guarantor's insolvency or inability to pay its debts as they become due or otherwise; or (v) any assignment for the benefit of creditors is made of Tenant's or guarantor's property under state law.

71. Tenant's Work and Alterations.   (a)   Supplementing the provisions of Article 3, Tenant shall make no changes or alterations in or to the demised premises at any time during the term of this Lease, of any nature without Owner's prior approval; provided, however, that Owner's approval to changes or alterations to the demised premises which are non-structural and which do not affect the plumbing, electrical, HVAC or other systems in the demised premises or the Building shall not be unreasonably withheld. Owner shall reasonably cooperate with Tenant, at no cost to Owner, in connection with obtaining necessary permits for the Alterations, which may include, without limitation, executing applications reasonably required by Tenant for such permits prior to commencement or completion of Owner's review of Tenant's Plans for such Alterations.

(b) Prior to commencing any work in the demised premises for which Owner's approval hereunder is required, Tenant shall submit to Owner for Owner's written approval complete drawings, three (3) sets of plans and specifications (collectively, "Tenant's Plan") for the improvements and installations to be made by Tenant (collectively, "Tenant's Work"). Tenant's Plan shall be: (i) fully detailed, (ii) show complete dimensions, (iii) not be in conflict with Owner's basic plans for the Building, (iv) not require any changes in the structure of the Building and (v) not be in violation of any laws, order, rules or regulations of any governmental department or bureau having jurisdiction of the demised premises. Tenant shall pay to Owner, promptly upon being billed and as additional rent, any actual and reasonable charges or expenses Owner may incur in reviewing Tenant's Plan including, without limitation the fees of any architects, engineers or other consultants engaged by Owner. Any review or approval by Owner of Tenant's Plan is solely for Owner's benefit, and without any representation or warranty whatsoever to Tenant with respect to the adequacy, correctness or efficiency thereof or otherwise.

(c) After submission to Owner of Tenant's Plan, Tenant shall not commence Tenant's work until Owner shall approve same. If Owner shall reject Tenant's Plan, Owner shall set forth in writing the particulars in which Owner does not approve same, in which case Tenant shall promptly return to Owner appropriate modifications thereto and such modifications shall be subject to Owner's approval. If Tenant makes any changes in Tenant s Plan subsequent to its approval by Owner same shall be subject to Owner's approval as provided in this Article 71 and if Owner consents to such changes, Tenant shall pay to Owner all costs and expenses caused by such changes, which Owner may incur or sustain by reason of delays or changes necessitated in the performance by Owner of any construction or work which Owner is performing in the Building; it being understood and agreed, however, that Owner shall have the right to refuse to consent to any such changes. Any charges payable under this Article 71 shall be paid by Tenant

from time to time upon demand as additional rent, whether or not the lease term shall have commenced. Following compliance by Tenant with its obligations under this Article 71, Tenant shall timely commence Tenant's Work in order to complete same within a reasonable period of time. Tenant's Work shall be diligently pursued and shall be performed in a good and workmanlike manner. In the event Owner's approval is required for Tenant's Work, Owner shall grant or withhold its approval for the proposed Tenant's Work, or request more information if the Tenant's Plans are incomplete) within twenty (20) business days after Owner's receipt of the Tenant's Plan. In the event Owner request additional information or withholds its approval, Owner shall grant or withhold its approval of the Tenant's Plan within fifteen (15) business days of its receipt of such additional information or modified Tenant's Plans. In the event Owner has not given its approval or rejection of the Tenant's Plans, or requested more information within the foregoing time frames, Tenant may provide Owner with a ten (10) business days' notice in capped, bold face, stating that "IN THE EVENT OWNER SHALL FAIL TO RESPOND TO THIS REQUEST FOR CONSENT WITHIN TEN (10) BUSINESS DAYS' FROM RECEIPT OF THIS NOTICE, OWNER SHALL BE DEEMED TO HAVE CONSENTED TO THE ENCLOSED TENANT'S PLANS FOR TENANT'S WORK HERETOBEFORE DELIVERED TO OWNER." If Owner shall fail to respond within such ten (10) business days period Owner's consent shall be deemed given with respect to the enclosed request.

(d) In the performance of Tenant's Work: (i) neither Tenant nor its agents or employees shall interfere with any work being done by Owner and its agents and employees to more than a de minimis effect; (ii) Tenant shall comply with any reasonable work schedule, rules and regulations proposed by Owner, its agents or employees including, without limitation, service elevator hours (and any necessary overtime shall be paid by Tenant at Owner's standard charge therefor); (iii) Tenant's contractors and subcontractors shall be approved by Owner, all work shall be performed by union labor with the proper jurisdictional qualifications and the labor employed by Tenant and its contractors or subcontractors shall be harmonious and compatible with the labor employed by Owner in the Building and if in Owner's judgment the labor is incompatible or is not part of the proper union then Tenant shall forthwith upon Owner's demand withdraw such labor from the Building; (iv) Tenant shall procure and deliver to Owner worker's compensation, public liability, property damage and such other insurance policies, in such amounts as shall be reasonably acceptable to Owner in connection with Tenant's Work, and shall cause Owner, the managing agent of the Building, any fee mortgagee, the holder of any superior lease and any others designated by Owner to be named as an insured thereunder; (v) Tenant shall hold Owner harmless from and against any and all claims arising from or in connection with any and all claims arising from any act or omission of Tenant or its agents or employees, (vi) Tenant's Work shall be performed in accordance with the approved Tenant s Plan and in compliance with the laws, orders, rules and regulations of any governmental agency having jurisdiction of the demised premises; and (vii) Tenant shall promptly pay for Tenant's Work in full and shall not permit any lien to attach to the demised premises or the Building.

(e) Except with respect to (i) any Tenant's Work to prepare Suite 1 or Suite 2 for Tenant's initial occupancy thereof, or (ii) any Tenant's Work that is non-structural and the cost of which either individually or the aggregate is less than Fifty Thousand Dollars ($50,000) in any calendar year, Tenant shall deliver to Owner, to secure the prompt and proper completion of Tenant's Work an irrevocable, unconditional, negotiable Letter of Credit, as described in Article 54(c) except that such Letter of Credit shall be in an amount equal to one hundred and twenty-five percent (125%) of the cost of Tenant's Work, as determined by Owner in its sole discretion, plus any additional rent hereinabove referred to. Such Letter of Credit shall expire not less than one (1) year after delivery to Owner and shall be renewed or replaced by Tenant not less than thirty (30) days prior to the expiration of the then current Letter of Credit until Tenant's Work is completed. Failure to deliver such new Letter of Credit on or before said date shall be a material breach of this Lease, and Owner shall have the right, inter alia, to present the then current Letter of Credit for payment. Upon (A) the completion of Tenant's Work in accordance with the terms of this Article 71 and (B) the submission to Owner of proof evidencing the payment in full for Tenant's Work, the Letter of Credit (or the balance of the proceeds thereof, if Owner has drawn on said Letter of Credit) shall be returned to Tenant. Upon Tenant's failure to properly perform, complete and fully pay for Tenant's Work, as determined by Owner, Owner shall be entitled to draw down, in whole or in part, on the Letter of Credit to the extent it deems necessary in connection with Tenant's Work, the restoration and/or protection of the demised premises or the Building and the payment or satisfaction of any costs, damages or expenses in connection with the foregoing and/or Tenant's obligations under this Article 71.

(f) Tenant shall be responsible for any disturbance or deficiency created in the mechanical, electrical or structural facilities within the building as a result of the alteration. If such disturbance or deficiency results, it shall be Tenant's responsibility to correct the resulting conditions and to restore the services to the reasonable satisfaction of Owner and its consulting engineers.

(g) If Tenant shall add to, modify or alter the existing heating, ventilation and/or air conditioning units, conduits, equipment, compressors and/or systems in or about the demised premises in such manner as to increase the cost to Owner of furnishing heat, ventilation, and/or air conditioning to the demised premises as hereinabove provided in Article 29, Tenant shall reimburse Owner for such increase in cost, from time to time, within ten (10) days after being billed therefor.

(h) Tenant shall submit the following certificates to Owner upon issuance: (a) approvals issued by the Department of Buildings; and (b) electrical certificates issued by the Department of Water Supply, Gas and Electricity and the Board of Fire Underwriters.

72. Preparation of Premises.

(a) Owner and Owner's representatives have made no representations or promises with respect to the Building or Suite 1, except as herein expressly set forth, and no rights, easements, or licenses are acquired by Tenant except as expressly set forth herein. Tenant shall accept possession of Suite 1 in the condition which shall exist on the Suite 1 Commencement Date (as hereinafter defined) "as is," and Owner shall have no obligation to perform any work or to make any installations in order to prepare the demised premises for Tenant's occupancy, except as set forth in Schedule A hereof. Owner shall cure any violations that may be against the Premises which may interfere with Tenant's alterations or use of the Premises prior to delivery of each of Suite 1 and Suite 2.

(b) Owner and Owner's representatives have made no representations or promises with respect to the Building or Suite 2, except as herein expressly set forth, and no rights, easements, or licenses are acquired by Tenant except as expressly set forth herein. Tenant shall accept possession of Suite 2 in the condition which shall exist on the Suite 2 Commencement Date (as hereinafter defined) "as is," and Owner shall have no obligation to perform any work (including, without limitation, demolishing Suite 2) or to make any installations in order to prepare the Suite 2 for Tenant's occupancy, other than to deliver same in broom-clean condition.

73. Commencement Date and Term.

(a) Suite 1 is presently occupied by a licensee (the "Licensee"). The Licensee's license for Suite 1 expires on or about January 19, 2015. On the date the Licensee actually vacates Suite 1 or as soon thereafter as practicable, Owner shall so notify Tenant and Owner shall promptly thereafter commence Owner's Standard Work. The term of this Lease shall commence with respect to Suite 1 on the date of substantial completion of Owner's Standard Work (the "Suite 1 Commencement Date") and shall expire on the Expiration Date (as hereinafter defined). Owner agrees to use reasonable efforts to remove the Licensee from Suite 1 in the event the Licensee holds over. The "Suite 1 Rent Commencement Date," shall mean the date that is four (4) months after Suite 1 Commencement Date.

(b) Suite 2 is presently occupied by another tenant (the "Other Tenant"). The Other Tenant's lease for Suite 2 expires on or about October 31, 2015. The term of this Lease with respect to Suite 2 shall commence on the earlier to occur of (i) November 1, 2015, or (ii) thirty (30) days after Owner delivers a notice to Tenant that Suite 2 is vacant (the "Suite 2 Commencement Date") and shall expire on the day prior to the tenth (10th) anniversary of the Suite 2 Rent Commencement Date (the "Expiration Date"). Owner will use commercially reasonable efforts, including commencing a summary possession and eviction proceedings, in the event the Other Tenant holds over past October 31, 2015. The "Suite 2 Rent Commencement Date," shall mean the date that is four (4) months after the Suite 2 Commencement Date. The term "demised premises" shall mean Suite 1 and Suite 2 after the Suite 2 Commencement Date.

(c) The provisions of this Article 73 shall constitute an "express provision to the contrary", and Tenant hereby waives any right to rescind this Lease, under Section 223(a) of the Real Property Law of the State of New York and further Tenant waives any damages which may

result from any delay in the substantial completion of Owner's Standard Work or delivery of possession of Suite 1 or Suite 2, as the case may be.

(d)     When the Suite 1 Commencement Date and Suite 2 Commencement Date have been determined, Owner and Tenant shall execute a memorandum or other writing expressly confirming the Suite 1 Commencement Date, the Suite 1 Rent Commencement Date, Suite 2 Commencement Date, Suite 2 Rent Commencement Date and the Expiration Date.

74. Recycling and Waste Disposal. Tenant shall, at its sole cost and expense, comply with all present and future laws, orders and regulations of all state, federal, municipal and local governments, departments, commissions, and boards regarding the collection, sorting, separation, recycling and disposal of waste products, garbage, refuse, and trash (including, without limitation, regulated or other hazardous waste). Tenant shall sort and separate such waste products, garbage, refuse and trash into such categories as provided by law, and in accordance with the rules and regulations adopted by Owner for the sorting and separating of such designated recyclable materials. All regulated waste and hazardous waste shall be separated into red bags or containers or other appropriately labeled bags or containers and removed from the Building and disposed of by an appropriately licensed waste hauler approved by Owner at Tenant's sole cost and expense in compliance with all applicable laws and regulations. Tenant shall maintain appropriate evidence thereof, including manifests and any other documents if required by law. Owner reserves the right, where permitted by law, to refuse to collect or accept from Tenant any waste products, garbage, refuse, or trash which is not separated and sorted as required by law. Where permitted by law, Owner reserves the right to require Tenant to arrange for such collection, at Tenant's sole cost and expense, utilizing a contractor satisfactory to Owner. Tenant shall pay all costs, expenses, fines, penalties, or damages which may be imposed on Owner or Tenant by reason of Tenant's failure to comply with the provisions of this Article, and, at Tenant's sole cost and expense, Tenant shall indemnify, defend, and hold Owner harmless (including legal fees and expenses) from and against any actions, claims, and suits arising from Tenant's non-compliance, utilizing counsel reasonably satisfactory to Owner, if Owner so elects. Tenant shall be liable to Owner for any costs, expenses, or disbursements, including attorneys' fees, of any action or proceeding by Owner against Tenant, predicated upon Tenant's breach of this Article. Tenant understands that local regulations governing recycling makes Tenant liable for noncompliance.

75. Cleaning and Extermination. (a) Tenant, at its sole cost and expense, shall: (i) keep the demised premises clean and in a neat, orderly, safe and sanitary condition; (ii) clean the interior and the exterior of the windows, glass, plate glass and doors (including, in each case, the frames thereof) in the demised premises; (iii) bag and remove all garbage and other refuse (other than regulated waste or hazardous waste which shall be handled as provided in Article 74) from the demised premises daily during the hours, in the manner and using the corridors and exits reasonably designated by Owner; and (iv) cause such garbage and refuse to be removed from the Building by a cartage service reasonably approved by Owner at Tenant's sole cost and expense. Tenant shall keep the demised premises reasonably free from rodents, pests and vermin and, in connection therewith, Tenant shall cause the demised premises to be exterminated with such frequency and in such manner as to prevent the existence of vermin or other infestation. In the event Tenant fails to keep the demised premises reasonably free from rodents, pests and vermin, Owner, at its option, may select an exterminator to perform such services on behalf of Tenant. If Owner does so, Tenant agrees to use such contractor to the exclusion of all other exterminators, devices, equipment or services. Tenant shall pay the charges therefor to such exterminator.

(b) Tenant's failure to promptly remedy and cure any unclean or unsanitary condition, after notice from Owner shall constitute a breach of a material and substantial obligation by Tenant under this Lease and Owner shall have the right to perform, at the expense of Tenant whatever extermination or other work it deems necessary in order to cure or remedy such condition including but not limited to extermination of portions of the Building other than the demised premises.

(c) Tenant shall cause all refuse and rubbish in the demised premises to be stored in sealed, watertight, containers so fashioned as to prevent damage to the demised premises and the Building. Tenant shall not suffer or permit Tenant's employees or any persons making deliveries to or from the demised premises or removing refuse and rubbish therefrom, to leave any food, refuse and rubbish containers or other matter standing upon the streets or sidewalks adjacent to the Building, in the public areas of the Building or anywhere other than in the

demised premises. If Tenant shall fail to comply with the foregoing provisions, Owner, in addition to all other remedies provided in this Lease and at law, may remove any food, refuse and rubbish containers and other matter so left standing without any liability on the part of Owner therefor, and the cost thereof shall be collectible as additional rent hereunder. If the demised premises shall have an appurtenant service entrance, Tenant shall cause all deliveries to and from the demised premises and refuse and rubbish removal to be made through such service entrance.

76. <u>Modification of Periods</u>. The five (5) days periods and three (3) day periods specified in <u>Article 17</u> are modified to ten (10) days and five (5) days respectively and the five (5) day period specified in <u>Article 19</u> is modified to ten (10) days.

77. <u>This Lease Is A Sublease</u>. (a) Notwithstanding the reference to this document as a "lease" and the reference to the Owner under this as "Owner", Owner is the tenant of the demised premises and other property pursuant to a lease (the "<u>Prime Lease</u>") from 800 Fifth Avenue Associates ("<u>Overlandlord</u>"). Tenant has reviewed a true and complete counterpart of the Prime Lease or waived its right to do so. Only the terms and conditions contained herein, however, shall govern the rights and liabilities of Owner and Tenant as between themselves, it not being intended that any of the terms or conditions of the Prime Lease be deemed incorporated herein.

(b) Owner represents that: (i) Owner is now the tenant under the Prime Lease; (ii) the Prime Lease is in full force and effect; (iii) Owner has not received any notice of default thereunder which remains uncured; (iv) the redacted copy of the Prime Lease delivered to Tenant is a true and complete copy of the Prime Lease from which certain financial information has been deleted; (v) Owner will serve due and timely notice of renewal of the Prime Lease to the extent required so that the Prime Lease shall not expire prior to the expiration of this Lease and any renewal options contained in this Lease and properly exercised by Tenant; and (vi) Owner will not voluntarily surrender the Prime Lease if such surrender shall adversely affect Tenant.

78. <u>Renewal Term</u>.

(a) Provided that either at the time of the exercise thereof or at any time on or before the effective date thereof Owner has not delivered a notice of default to Tenant that remains uncured, Tenant shall have a single option to extend the term of this Lease for a period of five (5) years (the "Renewal Term"). Tenant may exercise such option only by notice to Owner of such exercise given not less than twelve (12) months and not more than fifteen (15) months before the Expiration Date and must exercise the right for the entire demised premises (both Suite 1 and Suite 2). Tenant shall forever waive its right to exercise such option if it shall, for any reason whatsoever, fail to give such notice to Owner within the time and in the manner provided for the giving of such notice, whether such failure is inadvertent or intentional, TIME BEING OF THE ESSENCE as to the exercise of such option and the giving of such notice. If Tenant shall elect to exercise such option, the term of this Lease shall be automatically extended for five (5) years without the execution of an extension or renewal lease. Within ten (10) days after request by Owner, Tenant shall execute, acknowledge and deliver to Owner an instrument confirming that such option has been effectively exercised, confirming the extended Expiration Date and confirming the initial rent for the Renewal Term. The terms and conditions applicable during the Renewal Term shall be the same terms and conditions of this Lease as are in effect immediately preceding the commencement of the Renewal Term, except that: (i) the initial fixed annual rent payable during the first (1st) year of such Renewal Term shall be determined pursuant to <u>Article 78(b)</u>; (ii) during the Renewal Term the fixed annual rent (as initially determined pursuant to <u>Article 78(b)</u>) shall thereafter be increased annually pursuant to <u>Article 78(d)</u>; (iii) Tenant shall have no right or option to extend the term of this Lease for any period of time beyond the expiration of the Renewal Term; and (iv) the provisions of this <u>Article 78(a)</u> shall not apply during the Renewal Term. Notwithstanding anything to the contrary contained in this Lease, under no circumstances shall the term of this Lease extend for more than fifteen (15) years beyond the Commencement Date. Any termination, expiration, cancellation or surrender of this Lease on or prior to the Expiration Date shall terminate such option. Such option may not be severed from this Lease nor separately sold, assigned nor otherwise transferred.

(b) The fixed annual rent for the first year of the Renewal Term shall be the greater of: (i) $1,160,136.80; or (ii) the fair market rental value of the demised premises for the Renewal Term determined in accordance with <u>Article 78(c)</u> of this Lease if such determination is

requested by Owner. In no event shall the rent payable for any year during the term of this Lease be reduced below the rent paid for the prior year by reason of adjustments under any of the provisions of this Article 78.

(c) At the request of Owner, the fair market rental value of the demised premises for the Renewal Term shall be determined by appraisal in accordance with the provisions of this Article 78(c). If Owner requests such an appraisal, the notice requesting appraisal shall designate an independent MAI appraiser selected by Owner. Within ten (10) days after the giving of such notice, Tenant shall notify Owner of an independent MAI appraiser selected by Tenant. Within ten (10) days after selection of Tenant's appraiser, the two appraisers shall meet and attempt to agree as to the fair market rental value for the demised premises for the Renewal Term. In the event that such appraisers are unable to agree as to such annual fair market rental value then: (i) if the difference between the two determinations is less than five percent (5%) of the lower determination, then the average of the two determinations shall be deemed to constitute such annual fair market rental value; or (ii) if the difference between the two determinations is equal to or greater than five percent (5%) of the lower determination, then the two appraisers shall jointly select a third independent MAI appraiser, which appraiser shall select which of the determinations of the first two appraisers shall constitute such annual fair market rental value. Such third appraiser shall not have the right to vary or modify the determinations of the appraisers selected by Owner and Tenant. In the event that Tenant fails to select its appraiser within such ten (10) day period, the determination of Owner's appraiser shall constitute such fair market rental value. In the event that the two appraisers are unable to select a third appraiser, the third appraiser shall be selected by President of the Real Estate Board of New York, Inc. at the request of either Owner or Tenant. Any appraiser under this Article 78(c) must have at least ten (10) years' experience in appraising commercial real estate in the City of New York similar to the property in which the demised premises is located. The appraisers shall not have the right to amend, modify or vary any of the terms of this Lease and the determination of the appraisers in accordance with this Article 78(c) shall be final, binding and conclusive upon Owner and Tenant.

(d) The fixed annual rent for each of the subsequent years of the Renewal Term shall be increased by three percent (3%), on a compounded basis, over the fixed annual rent payable during the immediately preceding lease year.

(e) Any delay or failure of Owner in computing or billing for any rent adjustments permitted under this Article 78 shall not constitute a waiver or in any way impair the continuing obligation of Tenant to pay such rent adjustment hereunder. Notwithstanding any termination of this Lease prior to the lease expiration date, Tenant's obligation to pay rent as adjusted under this Article shall continue and shall cover all periods up to the expiration date and shall survive any expiration or termination of this Lease.

79. Cancellation Right.

(a)    As a material inducement to Owner to execute and deliver this Lease to Tenant hereby agrees that Owner shall have the option (the "Cancellation Option"), exercisable at Owner's sole discretion, to cancel this Lease, as hereinafter provided, in the event that Owner (or any transferee, successor or assignee of Owner) (i) has a bona fide intent to redevelop, demolish or substantially alter more than fifty percent (50%) of the square footage comprising the residential and the commercial components of the Building, in the aggregate (which shall include, but not be limited to, changing the primary use of the Building from residential rental to any other use, including without limitation conversion to a condominium or cooperative or hotel use or reconfiguring the floors of the Building), or (ii) Owner has a bona fide intent to lease or sell all or substantially all of the Building to a bona fide third party purchaser or lessee dealing at arm's length, which bona fide third party purchaser or lessee has a bona fide intent to redevelop, demolish or substantially alter more than fifty percent (50%) of the square footage comprising the residential and the commercial components of the Building, in the aggregate (which shall include, but not be limited to, changing the primary use of the Building from residential rental to any other use, including without limitation conversion to a condominium or cooperative or hotel use or reconfiguring the floors of the Building). If Owner shall desire to exercise the Cancellation Option, Owner shall send not less than one hundred eighty (180) days prior written notice thereof (the "Cancellation Notice") to Tenant setting forth the effective date for the cancellation of the term hereof (the "Cancellation Date"). In the event Owner shall send the Cancellation Notice to Tenant as previously provided, the term hereof shall cease and expire on

the Cancellation Date as if such date were expressly set forth as the Expiration Date of this Lease. Owner agrees that Owner may not deliver the Cancellation Notice prior to April 1, 2019.

(b)     In the event that Owner shall exercise the Cancellation Option and the term hereof shall expire as provided in Section 79(a), Owner shall pay to Tenant, on or before the Cancellation Date the sum of: (i) the then remaining unapplied balance, if any, of the security deposit; (ii) any prepaid fixed or additional rent applicable to periods after the Cancellation Date; and (iii) only if the Cancellation Date is prior to the initial Expiration Date (and not during the Renewal Term), the unamortized portion of the Improvement Amount (as hereinafter defined), amortized over ten (10) years using an interest rate of three percent (3%) per annum (the "Cancellation Fee"); less any sums that may then be due Owner arising out of the Lease (the result of this calculation is hereinafter referred to as the "Payment"). The "Improvement Amount" shall mean the actual-out-of pocket payments made by Tenant for the initial occupancy of Suite 1 and Suite 2, less the amount of the Tenant Fund, towards "hard costs" for improvements and alterations to the Demised Premises. No portion of the Improvement Amount shall be permitted to be used for furniture, art, or other removable personal property. Owner shall not be required to pay the Cancellation Fee unless Tenant has provided paid invoices evidencing the Improvement Amount. The Payment due Tenant shall be totally contingent upon Tenant's having quit, vacated and surrendered possession of the Demised Premises to Owner on or before the Cancellation Date. Tenant agrees further that Tenant shall, on demand, execute and deliver to Owner a written termination of lease agreement in recordable form. If there shall be a dispute as to the amount, if any, to be deducted from the Payment as due Owner, the undisputed portion thereof shall be paid to Tenant and the balance shall be deposited with the attorneys then representing Owner, to be held in escrow until a final and unappealable judgment or an agreement between the parties has been made respecting the disposition of any disputed portion of the Payment. Notwithstanding the foregoing, however, Owner shall not be obligated to make any part of the Payment unless and until Tenant shall have delivered possession of the Demised Premises to Owner as hereinabove provided.

(c)     In the event that Owner shall exercise the Cancellation Option and the term hereof shall expire as provided in Section 79(a), Owner shall pay to Tenant within thirty (30) days after the then remaining unapplied balance, if any, of the security deposit; less any sums that may then be due Owner arising out of this Lease (the result of this calculation is hereinafter referred to as the "Payment"). The Payment due Tenant shall be totally contingent upon Tenant's having quit, vacated and surrendered possession of the demised premises to Owner on or before the Cancellation Date. Tenant agrees further that Tenant shall, on demand, execute and deliver to Owner a written termination of lease agreement in recordable form.

(d)     Tenant hereby acknowledges its understanding that Owner will suffer great and irreparable damage, the extent of which is now and will in the future be impossible to quantify, in the event that Tenant shall fail to vacate and surrender possession of the demised premises to Owner as herein provided for. In view thereof, the parties hereto agree that in the event possession of the demised premises shall not be delivered by Tenant to Owner for any reason whatsoever on or before the close of business on the Cancellation Date, Owner shall have the following remedies available to it in addition to any other remedies it may have under this Lease in the event of a default and at law or in equity, which remedies Owner may exercise independently, in any sequence, or cumulatively at Owner's sole election, without the necessity for providing Tenant with any notice of such default or of Owner's exercise of any such remedies:

(e)     To enter a final order in any court of appropriate jurisdiction dispossessing Tenant from the demised premises and to cause a warrant to be issued without a stay of execution to which Tenant hereby consents and further agrees to hereby waive all rights that it may have to contest the same or to assert a claim for any award or compensation to which it may otherwise be entitled by reason thereof; and

(f)     To require Tenant to pay for each month and for each portion thereof without proration a sum equal to two (2) times the aggregate of the fixed annual rent and all additional rent which was payable under the Lease during or for the last month preceding the Cancellation Date, representing liquidated damages that Tenant acknowledges Owner will sustain as a result of a delay respecting the possession of the demised premises after the Cancellation Date, but in no event in an amount that exceeds the amount that may be charged under applicable law. If by the terms of this Section 79(f), Tenant is required or obligated to pay

rent at a rate in excess of that permitted by applicable law, such rent shall be deemed to be reduced to the maximum amount permitted by applicable law.

(g) This termination right is not personal to the original Owner named herein, but shall apply to all persons who succeed to the interests of Owner hereunder (including any party which executes a contract of sale and/or a lease for all or substantially all of the Building, even though that party is not yet the landlord).

80. Owner's Contribution.

(a) Owner shall contribute an amount not to exceed Four Hundred Thousand Dollars ($400,000) (the "Tenant Fund") for actual out-of-pocket payments made by Tenant toward (i) the "hard" cost of any Tenant's Work to prepare Suite 1 for Tenant's initial occupancy (the "Initial Alterations"), and (ii) architect's fees, permit fees, expediter's fees and designers' fees in connection with the Initial Alterations (such "soft costs" and related costs referred to in this clause (ii) incurred by Tenant in connection with the Initial Alterations being collectively referred to herein as "Related Costs"). The Tenant Fund shall only be available during the eighteen (18) month period after the Suite 1 Commencement Date.

(b) Owner shall disburse a portion of the Tenant Fund to Tenant from time to time, less a ten percent (10%) holdback (pending receipt of all of the items set forth in Section 82(e)), within thirty (30) days after receipt of the items set forth in Section 80(c) hereof, provided that on the date of a request and on the date of disbursement from the Tenant Fund no monetary default, or material non-monetary default, shall have occurred and be continuing. Disbursements from the Tenant Fund shall not be made more frequently than monthly, and shall be in an amount equal to the aggregate amounts theretofore paid or payable (as certified by the Chief Financial Officer of Tenant and Tenant's independent, licensed architect) to Tenant's contractors, subcontractors and materialmen which have not been the subject of a previous disbursement from the Tenant Fund multiplied by a fraction, the numerator of which is Four Hundred Thousand Dollars ($400,000) and the denominator of which is the total cost of the Initial Alterations as estimated by Tenant's independent licensed architect and as approved by Owner (which approval shall not be unreasonably withheld), which fraction shall be subject to readjustment as provided by Section 80(c) hereof (but in no event shall such fraction be greater than one (1)); provided, however, that (i) in no event shall Tenant be entitled to a disbursement from the Tenant Fund on account of Related Costs unless and until Tenant shall have received its first disbursement of the Tenant Fund for the cost of the Initial Alterations (other than Related Costs), and (ii) in no event shall disbursements of the Tenant Fund on account of Related Costs exceed Thirty-Five Thousand Dollars ($35,000). If Tenant fails to pay when due, any sums due and owing to any of Tenant's contractors or material suppliers, Owner shall have the right, but not the obligation, to promptly pay such contractor or supplier all sums due from Tenant, and sums so paid by Owner shall be deemed additional rent and shall be paid within ten (10) days after Owner delivers to Tenant an invoice therefor.

(c) Owner's obligation to make disbursements from the Tenant Fund shall be subject to Owner's verification of the total cost of the Initial Alterations as estimated by Tenant's independent licensed architect and receipt of: (a) a request for such disbursement from Tenant signed by the Chief Financial Officer of Tenant, together with the certification required by Section 80(b) hereof, (b) copies of all receipts, invoices and bills for the work completed and materials furnished in connection with the Initial Alterations and incorporated in Suite 1 which are to be paid from the requested disbursement or which have been paid by Tenant and for which Tenant is seeking reimbursement, (c) copies of all contracts, work orders, change orders and other materials relating to the work or materials which are the subject of the requested disbursement or reimbursement, (d) if requested by Owner, waivers of lien from all contractors and for any subcontractors and materialmen providing work or materials in excess of Twenty-Five Thousand Dollars ($25,000) involved in the performance of the Initial Alterations relating to the portion of the Initial Alterations theretofore performed and materials theretofore provided and for which previous disbursements and/or the requested disbursement has been or is to be made (except to the extent such waivers of lien were previously furnished to Owner upon a prior request), and (e) a certificate of Tenant's independent licensed architect stating (i) that, in his opinion, the portion of the Initial Alterations theretofore completed and for which the disbursement is requested was performed in a good and workerlike manner and substantially in

accordance with the final detailed plans and specifications for such Initial Alterations, as approved by Owner, (ii) the percentage of completion of the Initial Alterations as of the date of such certificate, and (iii) the revised estimated total cost to complete the Initial Alterations. If the revised estimated total cost of the Initial Alterations increases above the original estimated total cost of the Initial Alterations by more than five percent (5%), then the denominator of the fraction referred to in Section 80(b) hereof shall be adjusted appropriately.

(d) In no event shall the aggregate amount paid by Owner to Tenant under this Article 80 exceed the amount of the Tenant Fund. Upon the completion of the Initial Alterations and satisfaction of the conditions set forth in Section 80(e) hereof, any amount of the Tenant Fund in excess of One Hundred Thousand Dollars ($100,000) which has not been previously disbursed shall be retained by Owner. Upon the disbursement of the entire Tenant Fund (or the portion thereof if upon completion of the Initial Alterations the Tenant Fund is not exhausted), Owner shall have no further obligation or liability whatsoever to Tenant for further disbursement of any portion of the Tenant Fund to Tenant. It is expressly understood and agreed that Tenant shall complete, at its sole cost and expense, the Initial Alterations, whether or not the Tenant Fund is sufficient to fund such completion. Any costs to complete the Initial Alterations in excess of the Tenant Fund shall be the sole responsibility and obligation of Tenant.

(e) Within thirty (30) days after completion of the Initial Alterations, Tenant shall deliver to Owner general releases and waivers of lien from all contractors, subcontractors and materialmen involved in the performance of the Initial Alterations and the materials furnished in connection therewith (unless same previously were furnished pursuant to Section 80(c) hereof), copies of the "as built" plans and specifications, proof of satisfactory completion of all required inspections and issuance of any required approvals or permits and sign offs required in connection with the Initial Alterations, and a certificate from Tenant's independent licensed architect certifying that (i) in his opinion the Initial Alterations have been performed in a good and workerlike manner and completed in accordance with the final detailed plans and specifications for such Initial Alterations as approved by Owner and (ii) all contractors, subcontractors and materialmen have been paid for the Initial Alterations and materials furnished through such date.

(f) Notwithstanding anything in this Lease to the contrary, Owner shall only be obligated to pay the Tenant Fund to Tenant if Tenant has met the requirements of this Article and Articles 3 and 71 and submitted a complete and proper requisition for disbursement for the Tenant Fund within eighteen (18) months after the Suite 1 Commencement Date. TIME BEING OF THE ESSENCE. Should the foregoing not have occurred by such date for any reason, Owner shall be relieved of any and all obligations to pay the Tenant Fund, and neither Tenant's obligations nor this Lease shall in any way be affected thereby.

(g) In addition to the Tenant Fund, Owner shall contribute an amount not to exceed One Hundred Twenty-Five Thousand Dollars ($125,000) (the "Additional Tenant Fund") for actual out-of-pocket payments made by Tenant toward the "hard" cost of any Tenant's Work to prepare the Suite 2 for Tenant's initial occupancy. The Additional Tenant Fund may only be used for improvements to Suite 2. The disbursement of the Additional Terms shall be subject to the terms conditions of this Article 80, as appropriately modified for such suite.

81. Expedited Arbitration.

(a) Solely with respect to Article 45 in the event that Tenant disputes that Owner reasonably withheld its consent or approval where this Lease provides that Owner must be reasonable, either party may submit such dispute to an Expedited Arbitration Proceeding to be conducted in accordance with the provisions of this Article 81.

(b) The term "Expedited Arbitration Proceeding" shall mean a binding arbitration proceeding conducted in the Manhattan, New York under the Commercial Arbitration Rules of the JAMS, Inc. (or any successor organization located in New York City) and administered pursuant to the Expedited Procedures provisions thereof; provided, however, that with respect to any such arbitration, (i) the list of arbitrators referred to in Section E-4(b) shall be returned within five (5) Business Days from the date of mailing; (ii) the parties shall notify the American Arbitration Association (or its successor) by telephone, within four (4) Business Days, of any objections to the arbitrator appointed and, subject to clause (vii) below, shall have no right to object if the arbitrator so appointed was on the list submitted by the American Arbitration

Association (or its successor) and was not objected to in accordance with Section E-4(c) as modified by clause (i) above; (iii) the notification of the hearing referred to in Section E-7 shall be four (4) Business Days in advance of the hearing; (iv) the hearing shall be held within seven (7) Business Days after the appointment of the arbitrator; (v) the arbitrator shall have no right to award damages or vary, modify or waive any provision of this Lease; (vi) the decision of the arbitrator shall be made within five (5) Business Days after completion of the arbitration and shall be final and binding on the parties; and (vii) the arbitrator shall not have been employed by either party (or their respective Affiliates) during the period of five (5) years prior to the date of the Expedited Arbitration Proceeding.  The arbitrator shall determine the extent to which each party is successful in such Expedited Arbitration Proceeding in addition to rendering a decision on the dispute submitted.  If the arbitrator determines that one (1) party is entirely unsuccessful, then such party shall pay all of the fees of such arbitrator.  If the arbitrator determines that both parties are partially successful, then each party shall be responsible for such arbitrator's fees only to the extent such party is unsuccessful (e.g., if Owner is eighty percent (80%) successful and Tenant is twenty percent (20%) successful, then Owner shall be responsible for twenty percent (20%) of such arbitrator's fees and Tenant shall be responsible for eighty percent (80%) of such arbitrator's fees).

      82. Execution.  The submission of this Lease for examination does not constitute an offer by or to either party and this Lease shall be effective and binding only after execution and unconditional delivery by the parties hereto.

[END OF LEASE RIDER.]

EXHIBIT A

PLAN OF DEMISED PREMISES

See plan inserted following this page.   All dimensions on such plan are approximate.

[To Be Inserted]







SUITE 2 - GROUND LEVEL

**SCHEDULE A**

**OWNER'S WORK**

Scope of Demolition

General
Demo all existing tenant partitions, doors, frames and internal glazing
Demo all ceilings and lighting
Demo all floor coverings and adhesive material
Remove all wall base at exterior walls, core walls and columns
Demo all millwork, pantries, etc
Demo all old appliances

Plumbing
Demo all extraneous plumbing piping back to the riser and cap off
Demo any fixtures or water heaters unless directed to remain

Mechanical
Demo all interior zone diffusers and ductwork unless directed to remain
Demo any self- contained A/C units including duct and piping
Chilled water lines to be left stubbed and valved for tenant connection
Perimeter console units to remain

Electrical
Demo all lighting fixtures and related wiring except as noted
Demo all electrical wiring back to the panels
Tie up all fire alarm devices in the plenum
Remove any floor outlets and related wiring and patch holes
Remove any power outlets in interior partition walls
All exit lights to remain

Sprinkler
To remain if existing

Miscellaneous
All window treatment to be removed
Space to be turned over in broom swept condition
All elevator buttons, lanterns and doors in good and operable condition